# EXHIBIT 1

FRED NORTON (CA SBN 224725)
fnorton@nortonlaw.com
GIL WALTON (CA SBN 324133)
gwalton@nortonlaw.com
THE NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Telephone: (510) 906-4900

Attorneys for Plaintiff

MARC COHODES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC COHODES, an individual,<br><br>       Plaintiff,<br><br>   v.<br><br>MIMEDX GROUP, INC., a Florida corporation, DERRICK SNOWDY, an individual; and DANIEL GUY, an individual,<br><br>       Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

## SUMMARY OF THE ACTION

1.      Plaintiff Marc Cohodes is a former hedge fund manager, a long-time stock market analyst, and a short seller. Over his 40-year career as an investor and fund manager, Cohodes has exposed many publicly traded companies and individuals who were engaged in fraud, illegal conduct, questionable accounting, and stock manipulation, including Lernout & Hauspie, Media Vision Technology, NovaStar Financial, AremiSoft, California Micro Devices, Network Associates, TakeTwo Interactive, Krispy Kreme Donuts, Boston Chicken, MiMedx Group Inc., and others. His successful investigations of fraud in the financial markets have been described and applauded in *The Wall Street Journal*, *The New York Times*, *Barron's*, *Bloomberg*, *Institutional Investor*, CNN, award-winning books about financial fraud, and two Harvard business cases, among others.

2.      Cohodes's success in exposing frauds has earned him enemies as well as accolades. In this case, his enemies sought to retaliate against him by breaking the law – sending an unlicensed private investigator to befriend Cohodes on false pretenses, having the investigator illegally record Cohodes's phone calls, and then selectively disclosing, distorting, and misrepresenting Cohodes's phone calls, emails, and private conversations in an effort to damage his reputation and undermine his credibility with public securities markets and regulatory authorities in the United States and Canada.

3.      Derrick Snowdy is a private investigator who lied to Cohodes and Cohodes's acquaintances to gain access to Cohodes and learn information about Cohodes's business and his efforts to expose fraud, and then unlawfully recorded Cohodes's telephone conversations.

4.      Daniel Guy is the Chief Investment Officer and Director of Harrington Global, a hedge fund that lost money by investing in an overvalued company that Cohodes exposed. Guy hired Snowdy to spy on Cohodes and to record Cohodes's phone calls, paying him $25,000 per month. Then Guy and Snowdy tried to shop the illegal recordings and the improperly obtained information to yet another company, Callidus Capital, falsely claiming that Cohodes was part of a criminal conspiracy to manipulate Callidus's shares and launder money. Cohodes was harmed by these actions, which invaded his privacy, damaged his reputation, and forced him to incur

1  legal fees to investigate the scope of the intrusions and to defend himself against false

2  allegations of illegal behavior.

3       5.    MiMedx Group Inc. is a publicly traded company. Cohodes discovered in around

4  September 2017 that MiMedx was engaged in fraudulent accounting. In response to Cohodes's

5  warnings to the market, MiMedx engaged in a far-reaching campaign to defame Cohodes, to

6  discredit him, and to convince law enforcement that he, not MiMedx, was engaged in criminal

7  conduct. Those efforts included hiring Snowdy in December 2017, just as Guy had done, to

8  continue to spy on Cohodes, illegally record his phone calls, and obtain and disclose his private

9  communications.

10       6.    While these illegal actions did cause Cohodes harm, they did not achieve

11  MiMedx's larger goals: ultimately MiMedx's chief executive officer, Parker Petit, and its chief

12  operating officer, William Taylor, were convicted of a multi-million-dollar scheme to inflate

13  MiMedx's revenue and they were sentenced to prison. MiMedx's audit committee concluded

14  that the company had to restate over five years of financial statements as materially false. And

15  an internal investigation concluded that MiMedx and Petit had responded to internal employee

16  concerns about improper accounting by implementing a "secret video surveillance system" that

17  recorded management interviews of employees and those employees' discussions amongst

18  themselves "without those employees' knowledge or consent," and then used the improperly

19  obtained recordings to retaliate against whistleblowers and falsely accuse them of wrongdoing.

20       7.    From 2016 to 2019, Cohodes spoke on the phone with Snowdy scores, perhaps

21  even hundreds, of times. Cohodes had no knowledge or suspicion of Snowdy's illegal

22  recordings, or of Snowdy's, Guy's, and MiMedx's illegal use of them, until May of 2021. At

23  that time, a Canadian court unsealed records that revealed that Snowdy actually had been

24  working for Guy, that he had been recording Cohodes's phone calls, and that he and Guy had

25  mischaracterized those recordings and Cohodes's other communications to falsely accuse him of

26  crimes. In response to a reporter's questions about those documents, Snowdy admitted that he

27  had a phone that automatically recorded all calls to that number. Then, in August 2021, a hedge

28

1   fund that was suing MiMedx and its outside counsel persuaded a court to unseal records that

2   MiMedx and its counsel had produced in discovery, revealing for the first time that Snowdy had

3   also approached MiMedx and the company had also hired him to spy on Cohodes, obtain

4   "drafts" of tweets and articles before they were published and learn who "participated on any

5   calls, emails, or group messages" with Cohodes, along with other information that could not be

6   obtained through lawful means.

7                              **PARTIES**

8        8.     Plaintiff Marc Cohodes is an individual who resides in Montana and is a citizen of

9   Montana.  At the time of the events that are relevant to this lawsuit, Cohodes resided in Sonoma

10  County, California and was a citizen of California.

11       9.    On information and belief, Defendant Derrick Snowdy is an individual who

12  resides in Toronto, Ontario, Canada and is a Canadian citizen.

13      10.    On information and belief, Defendant Daniel Guy is an individual who resides in

14  Bermuda and is a Canadian citizen.

15      11.    On information and belief, Defendant MiMedx Group Inc. is a corporation

16  organized under the laws of Florida with its principal place of business in Marietta, Georgia.

17                     **JURISDICTION AND VENUE**

18      12.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this case

19  involves questions of federal law.

20      13.    The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because

21  the action involves a dispute between citizens of different countries.  Plaintiff Cohodes is a

22  resident and citizen of Montana, Defendant MiMedx is a corporation incorporated in Florida

23  with its principal place of business in Georgia; Defendant Snowdy is a resident and citizen of

24  Canada; and Defendant Guy is a resident of Bermuda and citizen of Canada.  Therefore,

25  complete diversity of citizenship exists.  The amount in controversy, including the value of both

26  monetary and injunctive relief, and exclusive of interests and costs, exceeds the sum or value of

27  $75,000.

28

14.     This Court has personal jurisdiction over Snowdy because, as part of the scheme to surveil Cohodes, Snowdy physically travelled to California and conducted business in the state by meeting with and surveilling Cohodes at his Sonoma, California home; by unlawfully recording at least one phone call that Cohodes made while in California; and by otherwise traveling to California to "infiltrate" a supposed conspiracy of stock manipulators, one of whom was purportedly Cohodes.  His scheme targeted California and Cohodes's activities in California.  This Court likewise has personal jurisdiction over Guy because Snowdy was at all relevant times acting as Guy's agent and at Guy's direction, including Snowdy's actions in and directed at California.  Cohodes's claims arise out of Snowdy's and Guy's plot to meet with and surveil Cohodes in California.

15.     This Court has personal jurisdiction over MiMedx because MiMedx engaged Snowdy to unlawfully spy on Cohodes in California and illegally record phone calls that Cohodes made in California.  Further, at the time of the events in question, MiMedx was registered to do business in the State of California, and did do business in California, though its current status is forfeited.  MiMedx had and has extensive and pervasive contacts with the State of California.  According to its corporate website, it holds a California tissue bank license from the California Department of Public Health; it has conducted clinical education programs at medical facilities in California; it has sold its products directly to medical facilities in California; it has filed suit as a plaintiff in federal courts in California on claims arising from its commercial activities in the state and submitted to jurisdiction here; and it has full time employees working for the company in California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District

## DIVISIONAL ASSIGNMENT

17.     Assignment to the San Francisco or Oakland Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the events or omissions giving rise to the claims occurred in Sonoma County.

# FACTUAL BACKGROUND

### A. Daniel Guy and Harrington Global Opportunity Fund's Failed Investment in Concordia Healthcare

18.     In or around October 2015, Cohodes began building a "short" position in the Canadian pharmaceutical company Concordia Healthcare. Investors "short" a stock by borrowing a security and selling it on the open market with the intention of buying it back later for less money, and then returning it to the original lender. Investors thus short a stock when they believe it is overvalued by the market and its price will decline in the future. Cohodes was aware that Concordia's chief executive officer, Mark Thompson, had previously been an executive at a different pharmaceutical company, Biovail, which had engaged in significant accounting fraud and paid millions of dollars to settle claims by the Securities and Exchange Commission. Cohodes pointed out that the company incurred enormous debt to buy up companies and prescription drugs that sold for modest amounts, with the goal of earning large profits by increasing the price of these well-established drugs by 1000% or more. If the company could not charge those inflated prices, it would be unable to repay its substantial debt. As Cohodes expected, increased awareness of pharmaceutical price hikes led to heightened political scrutiny of drug prices and made business models dependent on sizeable drug price increases, like Concordia Healthcare's, unsustainable. Concordia's Healthcare's business model was thus threatened, a particularly disastrous result given the company's approximately $4 billion of debt. In response to these events, Concordia Healthcare's share price dropped precipitously.

19.     In June 2016, Concordia CEO Thompson sued Cohodes for defamation related to Cohodes's criticisms of Thompson and Concordia. Shortly thereafter, as reported in *The Wall Street Journal*, the company reported significant asset write-downs, lowered its sales and profitability projections, announced its finance chief would step down, and suspended its dividend. Thompson ultimately resigned from Concordia and agreed to dismiss his lawsuit against Cohodes, recovering nothing.

20.     Daniel Guy is the Chief Investment Officer and a Director of Harrington Global

1  Opportunities Fund, a Bermuda-based hedge fund. Unlike Cohodes, Guy failed to understand

2  the flaws in the Concordia's business model. At the time Cohodes began building his short

3  position in Concordia, Harrington Global owned approximately 2.7 million of the 51 million

4  issued and outstanding common shares of the company. From its peak in June 2016, Concordia

5  lost $3.9 billion in market capitalization, and by 2017, Harrington Global Opportunity Fund was

6  forced to sell its shares of Concordia for a loss of approximately $150 million.

7       21.    Guy blamed short sellers for his bad investment. In an April 2018 email to the

8  Ontario Securities Commission, Guy – still angered over his losses from the Concordia

9  investment – threatened "a fucking war" if short sellers bet against another one of his

10  companies.

11  **B. Daniel Guy Hires Derrick Snowdy To Spy On Marc Cohodes**

12       22.    Derrick Snowdy is a Canadian private investigator. Daniel Guy and Snowdy

13  became acquainted when the Chief Financial Officer of Salida Capital – Guy's former fund –

14  asked Snowdy to perform due diligence on a potential investment.

15       23.    In or around October 2015, Guy hired Snowdy to investigate whether a group of

16  short sellers – including Cohodes – was acting in concert to manipulate the share price of

17  Concordia Healthcare. (There was no truth to those suspicions.) Guy paid Snowdy $25,000 per

18  month, plus expenses, for his services.

19       24.    In order to establish a relationship with Cohodes, Snowdy began introducing

20  himself to members of the short seller community in California. In 2015 and 2016, Snowdy met

21  with short seller Carson Block in San Francisco. Later in 2016, Snowdy pitched a story on

22  Canadian National Railway to Roddy Boyd, a journalist for the Foundation for Financial

23  Journalism and an acquaintance of Cohodes.

24       25.    Boyd agreed to take the Canadian National Railway story, and, as part of his

25  research, reached out to Snowdy. In 2016, Boyd travelled to Toronto and met with Snowdy. In

26  the course of that meeting, Snowdy asked Boyd for an introduction to Cohodes, and Boyd

27  agreed to send an email introducing the two. As part of his efforts to win Cohodes's trust,

28

Snowdy falsely claimed that he was considering an engagement adverse to Concordia's Thompson (whose defamation suit against Cohodes was still pending) and shared Cohodes's determination to expose liars and cheats. As Snowdy had intended, Boyd relied on those false representations and repeated them to Cohodes, who likewise relied on them as establishing that Snowdy was aligned with Cohodes with respect to Concordia.

26. Sometime in late 2016, after Snowdy had been introduced to Cohodes, Snowdy – still acting as Guy's agent – travelled to Sonoma, California, as part of the ongoing scheme to surveil Cohodes. To ingratiate himself with Cohodes, Snowdy visited Cohodes at his home and sought to curry favor with Cohodes and Cohodes's family. Snowdy thus used his trip to California to solidify his relationship with Cohodes, surveil him, and open a line of communication for later telephone calls.

27. As Snowdy later told lawyers for Catalyst, he took on an "undercover" role and "travelled to Los Angeles, San Francisco, Texas, New York City, and Florida over a one-year period and infiltrated the short sellers group."

28. On information and belief, Snowdy holds private investigator licenses from various Canadian provinces, but does not hold a private investigator license from California or any other U.S. state. Snowdy nonetheless engaged in the business of a private investigator, within the meaning of California Business & Professions Code § 7521, while in the State of California. Snowdy thus violated California Business & Professions Code §§ 7520 and 7523(a).

29. Snowdy obtained access to Cohodes through fraud and deceit. In particular, Snowdy falsely represented to Boyd and to Cohodes that Snowdy was adverse to Concordia's Thompson and aligned with Cohodes, when in fact Snowdy was being paid by Guy to try to prove that Cohodes had manipulated the stock of Concordia and other companies. At all times, Snowdy concealed from Cohodes his true employers and his true intentions in an effort to obtain access to Cohodes and information from Cohodes that Cohodes would not have provided had Snowdy told the truth.

30. In 2016, 2017, and 2018, Cohodes had scores of communications with Snowdy

1  using Cohodes's cellular telephone, as well as communications by email and in person.

2  Cohodes would not have communicated with Snowdy at all had he been aware that Snowdy was

3  working for Guy, that Snowdy was recording his phone calls, that Snowdy would disclose his

4  emails, phone calls, and private conversations to adverse third parties, or that Snowdy was

5  surveilling him.

6  **C. Guy Falsely Accuses Cohodes of Participating in Illegal Market Manipulation**

7      31.    On August 11, 2017, Guy sent Newton Glassman, the founder and managing

8  partner of Canadian hedge fund Catalyst Capital Group, an email claiming that Guy had

9  information suggesting that Glassman had been targeted by a group of short sellers who sought

10  to "bring [him] down." Guy did not send the email under his own name, but instead used the

11  pseudonym Vincent Hanna (the name of Al Pacino's character in the movie *Heat*).

12      32.    In his August 11 email, Guy asserted that the "RCMP [Royal Canadian Mounted

13  Police] and FBI [United States Federal Bureau of Investigation] are aware of this 'cabal' from a

14  criminal investigation but that doesn't help you in the short term." Guy then listed the investors

15  that he claimed were involved, including Cohodes "and his huge global network." In the email

16  exchange, Guy asserted that Cohodes, among others, was spreading false rumors in an effort to

17  manipulate the publicly traded securities of Callidus Capital (a lending company of which

18  Glassman was CEO) and had hired private investigators to follow Glassman around.

19      33.    Guy's statements about Cohodes were false and misleading and were intended (1)

20  to portray Cohodes as a market manipulator and "criminal" and (2) pique Glassman's interest in

21  speaking to Snowdy or Guy. Guy had no factual basis to assert that Cohodes, a well-known and

22  successful investor with a lengthy track record of identifying over-valued companies and

23  companies engaged in fraud, was conspiring with other short sellers, was engaged in unlawful

24  market manipulation, or was in any sense a "criminal." Moreover, Cohodes never took any

25  short position in Callidus Capital. Further, Snowdy had actually asked Cohodes about Callidus

26  and Cohodes had informed Snowdy that he had no position in that stock.

27      34.    Over the course of the next few weeks in August, Guy and Glassman

28  communicated back and forth attempting to arrange an in-person meeting. Although Guy was

1    eager to meet, Glassman insisted that Guy produce hard evidence or documentation of the

2    purported scheme.

3          35.    On August 23, 2017, Guy – still masquerading as "Vincent Hanna" – participated

4    in a conference call with Glassman and a few of Catalyst's lawyers.  In this call, Guy again

5    falsely described Cohodes as a participant in the purported unlawful scheme.  Guy claimed that

6    the decline of Concordia Healthcare was a "dry run" for the short sellers, and their next target

7    was Valeant Pharmaceuticals, a Canadian drug company.  Guy asserted that the group of short

8    sellers needed "big capital to take down Valeant" and suggested that they were working with the

9    "Russian mob."  When questioned about the alleged Russian connection, Guy admitted that he

10   "had no hard evidence" but claimed that "these guys talk about 'the big overseas guys in Hong

11   Kong' as their money launderer," and said that from this he concluded that the connection was

12   "Russian or Chinese."  Guy admitted that the source of this supposed information was his "PI"

13   (Snowdy, the private investigator).

14         36.    Guy's assertions that Cohodes was involved in an unlawful scheme to manipulate

15   the shares of Valeant in coordination with the Russian mob or other "money launderers" were

16   false and misleading.  Guy had no basis in fact to make those assertions.

17         37.    At the time Guy made these false statements, he also knew that Callidus was

18   planning to file a lawsuit against the short sellers and others that were supposedly manipulating

19   its securities.  As a result, Guy knew, or had reason to know, that the false statements that he had

20   made to Catalyst and its lawyers would be repeated to a much larger audience of market

21   participants, attorneys, investigators, and Canadian law enforcement agencies.

22         38.    Following this call, Guy and Glassman began communicating through WhatsApp,

23   an instant messaging service.  At some point on or before August 28, 2017, Glassman became

24   aware that "Vincent Hanna" was Daniel Guy, and began referring to him as Danny.

25         39.    In his messages with Glassman, Guy claimed that his investigation with Snowdy

26   was penetrating "the wolf pack" – their name for Cohodes and the group of short sellers – and

27   that Snowdy was on the "inside."  Guy repeatedly claimed that Snowdy had numerous emails

28

1   and taped communications from his conversations with the short sellers.

2   **D. Snowdy Boasts That He Recorded Numerous Telephone Conversations With Cohodes**

3   40.   On August 23, 2017, Guy messaged Glassman, "I think you should meet with the

4   PI and hire him.  He will deliver tapes and emails etc."  The "PI" Guy was referring to was

5   Snowdy.

6   41.   Guy arranged for Snowdy to meet with private investigators and lawyers working

7   for Catalyst on or about August 26, 2017.  In that meeting, Snowdy confirmed that Guy was

8   paying him $25,000 per month plus expenses for his services.  Snowdy was also asked whether

9   he had any recordings of his conversations with the short sellers he was surveilling.  Snowdy

10   responded that he had "tons" of recordings, including tapes of conversations with Cohodes.

11   42.   Following the meeting, Glassman received a debriefing from attendees suggesting

12   that Snowdy had no new or "actionable" information.  (In his communications with Guy,

13   Glassman used the term "actionable" to refer to information that was lawfully obtained.)

14   Glassman mentioned that Snowdy had alluded to recordings of Cohodes, but that they were not

15   played in the meeting.  Glassman stated that unless Snowdy was able to affirmatively prove that

16   he had information of value, Catalyst and its team would have nothing to do with him.

17   43.   Over the course of the following weeks, Guy repeatedly assured Glassman that

18   Snowdy had taped conversations with short sellers, including Cohodes.  For example, on August

19   28, 2017, Guy wrote to Glassman, "Yes he [Snowdy] has tapped [sic] conversations and tons of

20   emails."

21   44.   On August 30, 2017, Snowdy emailed Catalyst's outside attorney, John Kingman

22   Phillips, using the same email address he had used to communicate with Cohodes,

23   jdsnowdy@interlog.com.  In that email, Snowdy falsely claimed that he had attended a meeting

24   with "MC" (on information and belief, he was referring to Cohodes) in California in February

25   2017 where he was asked to "initiate an investigation into recruiting inside sources and

26   obtaining information/documents" related to Catalyst and Callidus.  Snowdy forwarded that

27   email to the email address danny@harringtongloballtd.com (Guy's professional email address)

28

1    and Guy then forwarded the email to Glassman. Glassman once again asked for Snowdy's

2    recording and wrote, "I sense your pi wants us to hire him and he would go inside. Good idea

3    but we r not doing so wout proof of his bona fides."

4       45.    By September, Guy had secured Snowdy a second meeting. On September 12,

5    2017, Snowdy attended another meeting with lawyers for Catalyst, including Phillips. In this

6    meeting, Snowdy repeatedly bragged about recordings of conversations he had with various

7    individuals, and he ultimately played a recording of a September 6, 2017 cellular telephone call

8    between Cohodes and Snowdy. Cohodes had not been aware that Snowdy was recording the

9    call, and he did not consent to recording. At the time of that call, Cohodes was in California.

10      46.    In fact, Snowdy has a practice of recording phone calls without the consent of the

11   other party. As Snowdy later confessed to Boyd, one of Snowdy's phones was programmed

12   with software to automatically record calls and store them on his home computer, in violation of

13   the Canadian Criminal Code Section 191(1).

14      47.    Also in this September meeting, Snowdy made a number of false statements about

15   Cohodes.

16           a.    Snowdy claimed that he had provided Cohodes with Concordia

17   Healthcare's 2016 Q4 numbers with slight alterations, and that he had told Cohodes that he

18   pulled the information "out of a dumpster." Snowdy then stated that, two days before

19   Concordia's Q4 numbers were made public, Cohodes shorted Concordia's stock based on the

20   information Snowdy fed him. Snowdy also claimed that Cohodes was receiving information

21   about Catalyst "from the inside." Snowdy's statements that Cohodes traded on information that

22   Cohodes believed to be inside Concordia information were false and misleading and were made

23   to paint Cohodes as a market manipulator. Snowdy had no basis for these allegations and knew

24   his statements were false at the time he made them.

25           b.    Snowdy falsely claimed that Adam Spears and Sunny Puri of Anson Group

26   Canada, an investment firm, regarded Cohodes as "their boss" and alleged that "the Anson

27   guys" had engaged in market manipulation or other unlawful schemes such as soliciting insider

28

1    information, planning to "infiltrate Callidus / Catalyst" to "get dirt or develop sources," and

2    coordinating a "short attack" on a public Canadian company called Badger Daylighting.

3    Snowdy also claimed that Anson managed some of Cohodes's money. At the same time,

4    Snowdy also linked Anson to allegations that the firm had manipulated the securities of

5    Callidus. Thus, Snowdy's statements falsely portrayed Cohodes as involved in an unlawful

6    conspiracy to manipulate securities. In fact, Anson did not manage any of Cohodes's money;

7    Cohodes was not the "boss" of Spears, Puri, or anyone else at Anson and gave no one at Anson

8    any reason to think of him that way; he did not direct or control the activities of anyone at

9    Anson; he did not coordinate a so-called "short attack" on Badger Daylighting; he did not

10    manipulate the shares of Callidus; and he did not even have a short position in Callidus and had

11    told Snowdy as much. Snowdy had no basis for these allegations and knew his statements were

12    false at the time he made them.

13           c.     During the August 26, 2017 meeting, Snowdy claimed that the cabal of

14    short sellers had set up 65 separate Twitter accounts that they would use to coordinate messages

15    at the same time without being connected to one another. During the September 2017 meeting,

16    Snowdy elaborated that he had analyzed data that Guy had purchased from Twitter in order to

17    investigate the alleged manipulation of Concordia stock, and had discovered that "[o]ne night,

18    Cohodes/ the cabal screwed up and all the accounts tweeted the same thing at the same time

19    about a telecom company in Sweden." These statements, alleging that Cohodes was involved

20    with a group of short sellers who were conspiring to send out negative information to

21    manipulate public traded securities, were false and once again falsely portrayed Cohodes as

22    engaged in unlawful market manipulation. Snowdy had no basis to make these statements with

23    respect to Cohodes, and knew he had no basis for those statements when he made them.

24           d.     Snowdy falsely asserted that Cohodes was a "puppet master" of the cabal

25    and falsely suggested that Cohodes had relationships with unnamed persons in "Hong Kong,

26    Europe, [and] the Caribbean" that were used for "money laundering and/or the facilitation of

27    exit cash from Asia." These statements falsely accused Cohodes of being engaged in crimes,

28

1   specifically conspiracy to manipulate securities markets and money laundering. Snowdy had no

2   basis to make these statements about Cohodes, and knew he had no basis for those statements

3   when he made them.

4           e.    Snowdy falsely claimed that he had an "ongoing relationship" with the

5   United States Department of Justice and falsely claimed that "they are running a large tax

6   evasion investigation" in which "Cohodes's name is 2nd on [the] list." To this day, Cohodes is

7   unaware of any "tax evasion" investigation of him. As a prominent critic of companies engaged

8   in accounting fraud and securities law violations, Cohodes has frequently been in contact with

9   U.S. enforcement authorities to report both suspected criminal behavior and violations of civil

10   laws. At no time has any enforcement authority ever suggested to him that he was the subject of

11   a "tax evasion investigation." Snowdy had no basis to make these statements about Cohodes,

12   and knew he had no basis for those statements when he made them.

13       48.    All of these statements about Cohodes were false when made. Snowdy had no

14   reasonable basis in fact to make those statements. To the contrary, they were fabrications by

15   Snowdy for the purpose of continuing his lucrative relationship with Guy, insinuating himself

16   with Glassman's advisors, and attempting to establish his own credibility as an effective

17   investigator.

18       49.    At the time that Snowdy made these false statements, he and Guy also knew that

19   Callidus was planning to file a lawsuit against the short sellers and others that were supposedly

20   manipulating its securities. As a result, Guy and Snowdy knew, or had reason to know, that the

21   false statements that Snowdy made to Catalyst and its lawyers would be repeated to a much

22   larger audience of market participants, attorneys, investigators, and Canadian law enforcement

23   agencies.

24       50.    After the meeting, Glassman messaged Guy that Snowdy needed to substantiate

25   every allegation he had made. In response, Guy claimed that Snowdy had "two years of stuff.

26   Tapes emails etc." Guy also insisted that Snowdy had a valuable email between Cohodes and

27   Canadian attorney Darryl Levitt discussing Catalyst and Callidus, but Glassman indicated that

28

1   he already had that document.

2          51.     In fact, Snowdy did disclose that email to Callidus.  In the subsequent Canadian

3   litigation between Catalyst and short sellers it sued, the short sellers alleged that the Catalyst

4   parties had obtained this email through illegal hacking.  The Catalyst parties responded by

5   asserting in a court filing in May 2021 that, in fact, "a copy of the email was obtained from

6   Derrick Snowdy who obtained it from Cohodes."  Thus it is confirmed that Snowdy did obtain

7   Cohodes's emails and disclosed them to Catalyst.  Further, although Glassman told Guy he had

8   doubts about the credibility and quality of Snowdy's information, he later admitted at a

9   deposition in May 2021 that he made those statements to "put pressure" on Guy in the hopes of

10  getting the tapes that Snowdy promised.

11         52.     Likewise, internal communications that were unsealed in Canadian litigation in

12  May 2021 revealed that Glassman and his lawyers did credit the false and defamatory

13  information that Guy and Snowdy fed them.  For example, a September 13, 2017 chat message

14  sent by a member of Catalyst's investigation firm, Black Cube, contained the following

15  statement (typos and misspellings in original):

16         Jim and Naomi (Brian's jr lawyer) just finished a mtng w a 'source'- Vincent
           Hanna's pi. I have asked that Naomi's hand written notes be fwded to u asap and
17         followed up when typed up. 2 of the important 'facts' that need to be chased
           down: 1. 'Levitt', one of the fortress principals and a former norton rose lawyer,
18         allegedly wrote an email to cohodes asking for direction etc on how to manipulate/
           use the whistleblower pgm and other 'advice'. Jim literally saw the emails on
19         snowdy's computer. This is unequivocal proof of both conspiracy AND intent to
           manipulate BOTH the mkt (criminal) and abuse he whistleblower system (quasi-
20         criminal). This is very serious and very valuable to us. 2. Snowdy alleges he has
           proof cohedes has chinese backing/$. If we find out who it is and sick the chinese
21         backers on cohedes, that could be a good fact for us. Snowdy also alleges anson
           partners Canada are the most dirty of the Wolfpack. If prove that and connection
22         to west face, very helpful.

23         53.     While Cohodes did in fact email with Levitt, they did not in any way discuss

24  manipulating the market or the whistleblower system, and Snowdy's characterization of the

25  email he improperly disclosed was false and misleading.  Likewise, Snowdy's claim that

26  Cohodes had "chinese backing/$" was false.  But Catalyst and its attorneys and investigators

27  credited Snowdy's smears of Cohodes and acted on them.

28

---

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

14

54.    Guy continued to press Glassman that Snowdy was still working for Guy and could be useful. For example, on November 9, 2017, Guy messaged Glassman that "Anson reached out to my guy to meet when Suni [sic] Puri is back in a week. I think he may be overseas with Cohodes. Now I would pay my guy to tape all these conversations." Glassman declined.

55.    Although Snowdy and Guy had every incentive to prove their claims about Cohodes, they never did so.

### E. Documents Revealing Snowdy and Guy's Surveillance of Cohodes Are Unsealed in Canada

56.    While Guy was attempting to pitch Snowdy and the short-seller investigation to Newton Glassman, Glassman and Catalyst Capital were involved in a series of contentious lawsuits in Canada. In 2017, Catalyst sued a number of hedge fund managers and journalists for defamation. At the center of the litigation was an article published in the Wall Street Journal alleging that Catalyst Capital was engaged in criminal or fraudulent activities and was under investigation for those activities. Catalyst's lawsuit alleged that a group of short sellers requested publication of the article to attack Catalyst. Catalyst's lawsuit resulted in a series of other Canadian lawsuits.

57.    During these lawsuits, discovery uncovered a mass of documents related to Cohodes, Guy, and Snowdy. Among these were the WhatsApp messages between Glassman and Guy discussing Snowdy's investigation into Cohodes; lawyer's notes summarizing the August 26, 2017 meeting between Snowdy and Catalyst; and lawyer's notes summarizing the September 12, 2017 meeting between Snowdy and Catalyst, in which Snowdy played the recording of one of his calls with Cohodes, all as described above.

58.    These records were unavailable to Cohodes or the public until May 2021, when the Ontario Superior Court of Justice unsealed the documents.

59.    Once the documents were unsealed, Cohodes discovered that Guy had hired Snowdy as his agent to surveil and investigate Cohodes and other short sellers. Cohodes likewise discovered that Snowdy, acting as Guy's agent, had recorded their cellular or cordless

1 | telephone communications in both 2016 and 2017 without his consent. Before that time, there

2 | was nothing Cohodes could have reasonably done to discover that Guy had hired Snowdy as his

3 | investigator or that his calls with Snowdy were being recorded.

4 | **F. MiMedx Also Uses Snowdy to Spy on Cohodes**

5 |     60.    Around September 2017, Cohodes began to follow allegations about improprieties

6 | at MiMedx Group, Inc., a publicly traded company that processes, markets, and distributes

7 | medical products. Cohodes became a vocal critic of MiMedx based on his assessment of the

8 | company's publicly reported financial results and his doubts about the effectiveness of the

9 | company's products, among other concerns. He ultimately concluded that MiMedx had (a) paid

10 | doctors to tout MiMedx's products without disclosing the payments; (b) shipped products to

11 | entities that did not pay for the product but instead relied on MiMedx to sell that product (also

12 | called "channel stuffing"); and (c) directed and encouraged customers of MiMedx products to

13 | use incorrect billing codes when billing government entities to increase government

14 | reimbursements, and then shared the proceeds with the entities or individuals who miscoded the

15 | reimbursement forms.

16 |     61.    Cohodes published his criticisms of MiMedx using a Twitter account that

17 | identifies him by name and a website he had set up to document questionable accounting and

18 | sales practices at MiMedx.

19 |     62.    Around this same time, the summer or fall of 2017, an anonymous blogger

20 | operating under the pseudonym "Aurelius Value" posted an article about MiMedx describing

21 | ongoing fraud at the company. Shortly after Aurelius published the article, MiMedx published a

22 | press release claiming that Aurelius Value's claims were false. In that article, MiMedx

23 | conceded that it did not know the identity of Aurelius Value, but it promised to hold the blogger

24 | "accountable." (Cohodes is not Aurelius Value and had nothing to do with the article.)

25 |     63.    On October 4, 2017, MiMedx filed a lawsuit against Sparrow Fund Management

26 | LP, a New York hedge fund manager and investment advisory firm. MiMedx alleged, among

27 | other things, that partners at Sparrow were blogging under the name Aurelius Value and were

28 |

1  trying to manipulate the price of MiMedx shares. Ultimately, MiMedx conceded that neither

2  Sparrow nor its principals were Aurelius Value, and MiMedx dismissed its lawsuit. Sparrow

3  responded by suing MiMedx for malicious prosecution in federal court in New York and sued

4  MiMedx's outside counsel in Los Angeles Superior Court.

5        64. On October 24, 2017, shortly after MiMedx filed its lawsuit against Sparrow and

6  at the very same time that Guy and Snowdy were falsely accusing Cohodes of trying to

7  manipulate the shares of Canadian companies, a person using an anonymized email and calling

8  themselves "an MDXG friend" wrote to MiMedx executives. The email stated that MiMedx

9  was "on the right track" in its lawsuit and purported to identify "criminal short sellers" who

10  were part of the "MDXG cabal" and who "worked closely with Marc Cohodes." (MDXG is the

11  stock ticker symbol for MiMedx.) MiMedx then provided this anonymous smear to the United

12  States Department of Justice in an effort to shift attention away from its own misconduct and

13  onto Cohodes. Cohodes obtained a heavily redacted copy of this email in response to a Freedom

14  of Information Act request. The copy that was produced to him redacts the email address of the

15  sender and recipients, and all names other than his own. On information and belief, the

16  anonymous email to MiMedx was sent by Snowdy.

17        65. The anonymous email found a receptive audience at MiMedx. MiMedx escalated

18  with personal attacks on Cohodes in an effort to discredit him and distract the market and

19  regulators from MiMedx's criminal conduct. On the main page of its corporate website,

20  www.mimedx.com, the company included a link to "Short Selling Commentary" that posted

21  numerous articles directly attacking Cohodes, including posts by MiMedx and Petit on October

22  24, October 27, October 30, November 2, December 14, and December 28, 2017.

23        66. Documents from the Sparrow-MiMedx litigation, first revealed to Cohodes when

24  they were made public in August 2021, confirm that MiMedx either approached, or was

25  approached by, Snowdy to try to demonstrate a connection between Sparrow, Cohodes, and

26  Aurelius Value, and that Guy touted the illegal work Snowdy had done for Guy to convince

27  MiMedx to hire Snowdy. For example, a February 2018 invoice from the investigation firm

28

Mintz Group, detailing work that Mintz performed on behalf of MiMedx in mid-December 2017, reports that the firm at that time "[c]onducted online, press and social media searches for Danny Guy to determine his background; searched for Guy's involvement with Concordia; reviewed Cohodes's tweets targeting Concordia; . . . searched for social media accounts belonging to Snowdy; reviewed Snowdy's Twitter profile and interactions with Cohodes; . . . [c]onducted press research on Derrick Snowdy and wrote update on him." Mintz investigators also billed for time spent on "several conferences with investigators on Anson, Guy and Snowdy findings." On information and belief, Snowdy took advantage of his illicitly obtained recordings and shopped the information around to potential customers – companies like MiMedx that wished to surveil Cohodes.

67. In addition, Snowdy later stated that around this time, he attended a meeting that included representatives of both MiMedx and Guy, specifically:

    a. MiMedx CEO Petit,

    b. David M. Pernini (an attorney at Wargo French, a law firm that was then outside counsel to MiMedx in its litigation against short sellers and employee whistleblowers),

    c. Ed Borkowski, formerly the CFO of Concordia, who became executive vice president and interim finance chief of MiMedx in spring 2018, and

    d. an unidentified lawyer for one of Guy's companies.

68. Snowdy was successful in pitching his services to MiMedx. On January 15, 2018, emailed Snowdy and copied Lexi Haden, then general counsel of MiMedx. Pernini confirmed that "[w]e received your signed copy of the engagement agreement" and set forth in detail "the general objectives of MiMedx for the engagement." Pernini's list of objectives made clear that he and MiMedx expected that Snowdy had, or could obtain, access to Cohodes's emails, phone calls, tweets, and other confidential information. For example, Pernini's list of MiMedx objectives included

    a. obtaining "advanced notice of any upcoming attacks or damaging articles or tweets on MiMedx";

b.    getting "drafts of articles (or tweets)" in advance;

c.    learning who "participated on any calls, emails, or group messages" with Cohodes that concerned MiMedx:

d.    learning "who is the money behind Cohodes";

e.    learning whether "Cohodes is being paid for his actions";

f.    learning whether current or former employees of MiMedx had been in contact with Cohodes, and obtaining "a list of employees that Cohodes and others are targeting for information";

g.    investigating "any other evidence of illegal activity by Cohodes, such as front running, naked shorting, money laundering, etc."

69.    A copy of Pernini's January 15, 2018, email to Snowdy is attached hereto as Exhibit A. This document was retrieved from a publicly available court filing.

70.    At the time that Pernini engaged Snowdy on behalf of MiMedx, Snowdy was not licensed as a private investigator in any U.S. state.

71.    On January 19, 2018, Pernini followed up with another email to Snowdy, stating that he had received a voicemail from Snowdy and adding an additional "objective" to Snowdy's engagement.

72.    On January 26, 2018, not long after MiMedx had retained Snowdy to spy on Cohodes, MiMedx CEO Petit published a post titled "Cohodes' Illegal Selling Operations." The article mimicked some of the false and defamatory allegations that Snowdy and Guy had made against Cohodes in Canada just weeks before. For example, MiMedx's post stated:

a.    "We believe Marc Cohodes and his cabal orchestrate and participate in illegal short selling attacks . . . ."

b.    "In MiMedx's case, we believe Cohodes is probably being paid by certain hedge funds that have developed substantial losses over the years by short selling the Company."

c.    Cohodes had one of his "publication shills" write a "fraudulent memo"

1   purportedly by a former MiMedx employee and then circulated it to major media sources and

2   regulators.

3        73.    Each of the statements recounted above about Cohodes was false and defamatory

4   and intended to both harm Cohodes's reputation and conceal MiMedx's, Petit's, and Taylor's

5   illegal conduct.

6        74.    In January 2018, Cohodes wrote to MiMedx's independent auditors, Ernst &

7   Young, alerting them to the accounting issues that he had identified through his investigations.

8   Upon review of that letter, Ernst & Young notified MiMedx that it would need to investigate

9   those issues and could not certify MiMedx's 2017 financial statements.

10       75.    Then, on February 26, 2018, Bloomberg published an article reporting that the

11  United States Department of Justice was investigating whether MiMedx was overcharging the

12  federal government, and whether it was engaged in a fraudulent sales and accounting practice

13  called "channel stuffing."

14       76.    The next day, MiMedx responded by claiming it was unaware of any such

15  investigation and by trying to deflect the bad news by attacking Cohodes. In a press release

16  published on the MiMedx website, the company stated:

17       The public should be well aware that the Company has been under a concerted,

18       illegal short selling attack since September. This group of illegal short sellers,

19       which the Company believes includes Marc Cohodes, Aurelius Value, Viceroy

20       Research, and other numerous hedge funds and individuals, has publicized a

21       continuous stream of misinformation and lies about numerous aspects of the

22       Company's business.

23       77.    Once again, these statements about Cohodes were false and defamatory and

24  intended to both harm Cohodes's reputation and conceal MiMedx's, Petit's, and Taylor's illegal

25  conduct.

26       78.    Snowdy obtained money or other items of value from MiMedx or its agents on the

27  basis of his claims that he had, or could obtain, recordings of Cohodes, emails to or from

28

1    Cohodes, and information that would show Cohodes unlawfully manipulating MiMedx
2    securities.

3          79.    The "objectives" that MiMedx and Pernini provided to Snowdy pursuant to
4    MiMedx's engagement of him could not be achieved, as a practical matter, without Snowdy
5    engaging in fraud, deceit, and unlawful recording of telephone calls or other wire
6    communications.  Moreover, MiMedx itself had a pervasive practice of improperly recording its
7    own employees in an effort to retaliate against and discredit whistleblower employees.  An
8    internal investigation conducted by MiMedx's outside counsel found that Petit oversaw an
9    internal spying program called "Project Snow White" that generated at least 2,750 hours of
10   secret surveillance video of its own employees, plus secret recording of telephone conversations,
11   all obtained without the consent of all the participants.  On information and belief, Cohodes
12   alleges that MiMedx, through its employee or agent Snowdy, also recorded Cohodes's telephone
13   conversations without his knowledge or consent and subjected him to video surveillance.

14         80.    In the end, Cohodes was vindicated.  MiMedx ultimately withdrew its annual
15   financial statements for the years 2012 through 2016, plus the quarterly financial statements for
16   the first, second, and third quarters of 2017.  MiMedx's stock was delisted, both Petit and
17   MiMedx's COO William Taylor were ultimately convicted of securities fraud and sentenced to
18   prison, and on April 6, 2020, the company announced that it had agreed to pay $6.5 million to
19   resolve False Claims Act allegations that it knowingly submitted false information to the
20   Department of Veterans Affairs.

21   **G. Harms to Cohodes and Unlawful Benefits to Snowdy**

22         81.    As a direct and proximate result of Snowdy's and Guy's unlawful conduct,
23   Snowdy and MiMedx unjustly benefitted and Cohodes was damaged.

24         82.    First, Snowdy was unjustly enriched by the amount of $25,000 per month, plus
25   expenses, that Guy paid Snowdy to lie to Cohodes, record Cohodes's phone conversations,
26   disclose Cohodes's emails, and defame Cohodes to third parties.

27         83.    Second, Snowdy was also unjustly enriched by the amounts that MiMedx or other
28

---

third parties paid him, wholly or partly in reliance on Snowdy's past success in unlawfully obtaining Cohodes's emails and phone calls, to surveil Cohodes or to seek access to Cohodes's confidential communications again.

84.     Third, by spying on Cohodes and obtaining information about him unlawfully, MiMedx, Petit, and Taylor were able to persuade some market participants and regulatory agencies, at least temporarily, that they were victims of securities fraud rather than perpetrators of it, which allowed them to retain the benefits of their illegal conduct.

85.     Fourth, Cohodes was directly harmed in that, among other harms,

a.     Snowdy unlawfully and improperly obtained access to Cohodes's home, as a trespasser;

b.     Snowdy unlawfully and improperly obtained access to Cohodes's private business information concerning Cohodes's lawful efforts to expose fraud and questionable accounting at Concordia and at Badger Daylighting, among other companies;

c.     Snowdy undermined and interfered with Cohodes's lawful efforts to expose fraud and questionable accounting at Concordia and at Badger Daylighting, among other companies, by disclosing Cohodes's emails and phone calls to third parties;

d.     Snowdy unlawfully invaded Cohodes's privacy by obtaining access to his home and recording his phone calls; and

e.     Snowdy defamed Cohodes and harmed him in his professional reputation by asserting, contrary to fact, that Cohodes was a criminal, a stock manipulator, a tax evader, and a money launderer.

## FIRST CAUSE OF ACTION
### Violation of the California Invasion of Privacy Act Under California Penal Code § 632.7 Against All Defendants

86.     Plaintiff repeats and realleges paragraphs 1- 85.

87.     As part of a scheme to accuse Cohodes and other short sellers of supposed market manipulation, Defendant Guy employed Defendant Snowdy in October 2015 for the purpose of surveilling Plaintiff Cohodes, a California resident.

88.     As part of this scheme, Snowdy engaged in cellular or cordless telephone communications with Cohodes to gather information.

89.     From 2016 and into 2018, Snowdy intentionally record dozens of cellular or cordless telephone communications between himself and Cohodes. All of Cohodes's telephone communications with Snowdy were made using Cohodes's cellular phone.

90.     At no time did Snowdy inform Cohodes that their cellular or cordless telephone communications were being recorded, and at no point did Cohodes consent to the recording of the communications.

91.     Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes were all undertaken at the direction of Guy, while acting as Guy's agent or employee.

92.     Beginning in December 2017, Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes were also undertaken at the direction of MiMedx, while acting as MiMedx's agent or employee.

93.     From 2016 to 2019, Cohodes remained a California resident and California citizen, and Snowdy's, Guy's, and MiMedx's surveillance of him were directed at him in California.

94.     Cohodes first became aware that Snowdy had recorded their cellular or cordless telephone communications when, in May 2021, documents produced in a series of Canadian lawsuits were unsealed by the Ontario Superior Court of Justice.

95.     As a California resident, Cohodes is guaranteed a right to privacy by not only the California Constitution, but also by California Penal Code § 630 *et seq.* California Penal Code § 637.2 – a section of the California Invasion of Privacy Act – provides a civil cause of action against those who record a communication between a cellular or cordless telephone and another telephone without the consent of all parties in violation of California Penal Code § 632.7. California Penal Code § 637.2 fixes the amount of damages recoverable at $5,000 per violation.

96.     California Penal Code § 637.2 further entitles Plaintiff Cohodes to bring an action to enjoin and restrain any violation of California Penal Code § 630, *et seq.*

97.    By recording dozens of cellular or cordless telephone conversations with Cohodes without his knowledge or consent, Snowdy, Guy, and MiMedx violated California Penal Code § 632.7.

98.    As the direct and proximate result of Defendants' violations of California Penal Code § 632.7, Plaintiff Cohodes has suffered damages and ongoing irreparable harm in the form of invasion of privacy.

99.    As a direct result of Snowdy's unlawful recording of Cohodes's phone calls, Snowdy has been unjustly enriched, including but not limited to the $25,000 per month that he was paid by Guy, and all sums that he was paid by MiMedx.

100.    Each of the Defendants acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

## SECOND CAUSE OF ACTION
### Violation of the Wiretap Act (18 U.S.C. §§ 2511)
### Against All Defendants

101.    Plaintiff repeats and realleges paragraphs 1-100.

102.    The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. . . ." 18 U.S.C. § 2510(12).

103.    ECPA also broadly defines the contents of a communication.  Pursuant to ECPA, "contents" of a communication, when used with respect to any wire, oral, or electronic communications, include any information concerning the substance, purport, or meaning of that communication.  18 U.S.C. § 2510(8).

104.    Part of ECPA is the Wiretap Act, 18 U.S.C. § 2511, which prohibits the interception and disclosure of wire, oral, and electronic communications.  Although the Wiretap Act generally only requires the consent of one party to a communication to record the communication, a party may not record a communication for the purpose of committing any

1 criminal or tortious act in violation of federal or state law.  18 U.S.C. § 2511(2)(d).

2     105.  The Wiretap Act also provides a civil cause of action for any person whose wire or

3 electronic communications have been intercepted, disclosed, or intentionally used in violation of

4 18 U.S.C. § 2511, as well as for the disclosure or use of the contents of such intercepted

5 communications.

6     106.  Cohodes's cellular phone calls with Snowdy are "electronic communications"

7 under ECPA.

8     107.  At no time did Snowdy inform Cohodes that telephone communications were

9 being recorded, and at no point did Cohodes consent to the recording of the communications.

10     108.  Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes

11 were all undertaken at the direction of Guy, while acting as Guy's agent or employee.

12     109.  Beginning in December 2017, Snowdy's recording of Cohodes's phone calls and

13 his efforts to surveil Cohodes were also undertaken at the direction of MiMedx, while acting as

14 MiMedx's agent or employee.

15     110.  From 2016 to 2019, Cohodes remained a California resident and California

16 citizen, and Snowdy's, Guy's, and MiMedx's surveillance of him was directed at him in

17 California.

18     111.  Snowdy later disclosed the contents of at least one of those calls to lawyers and

19 executives at Catalyst.  On information and belief, Snowdy also disclosed the contents of those

20 calls to MiMedx.

21     112.  Even if Snowdy himself consented to recording the communications, he and Guy

22 violated 18 U.S.C. § 2511(2)(d) because he recorded the calls for the purpose of committing

23 defamation and false light invasion of privacy, both torts under California law.  In addition, Guy

24 and MiMedx violated 18 U.S.C. § 2511(2)(d) because Snowdy recorded calls on behalf of

25 MiMedx for the purpose of concealing and continuing MiMedx's, Petit's, and Taylor's ongoing

26 securities fraud, in violation of 15 U.S.C. § 78j(b) and 15 U.S.C. § 78ff (as well as other federal

27 and state securities las and regulations), and for the purpose of defaming Cohodes.

28

113.   As the direct and proximate result of Snowdy's intentional recording and disclosure of Cohodes's cellular telephone calls, Cohodes has suffered damages.

114.   As a direct result of Snowdy's unlawful recording of Cohodes's phone calls, Snowdy has been unjustly enriched, including but not limited to the $25,000 per month that he was paid by Guy, and all sums that he was paid by MiMedx.

115.   Defendants acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

## THIRD CAUSE OF ACTION
### Defamation – Slander Under California Civil Code § 46
### Against Defendants Snowdy and Guy

116.   Plaintiff repeats and realleges paragraphs 1-115.

117.   As alleged above, in his written and oral communications with Glassman and Catalyst's attorneys, Guy made numerous false assertions of fact that were intended to, and had the effect of, portraying Cohodes as a criminal, actively conspiring with other criminals to manipulate public securities markets and launder money.

118.   As alleged above, in oral communications with Catalyst's attorneys and advisors, Snowdy made numerous false assertions of fact that were intended to, and had the effect of, portraying Cohodes as a criminal, actively conspiring with other criminals to manipulate public securities markets, launder money, and evade taxes.  With respect to the statements by Snowdy, he made them at the direction of Guy, while acting as Guy's agent or employee.

119.   Guy's and Snowdy's statements and their implications of criminal behavior by Cohodes were false.

120.   At the time they each made these statements, Guy and Snowdy knew they were false and unsubstantiated.

121.   Snowdy was incentivized to claim that Cohodes was acting illegally in order to stir up interest in the calls he had recorded between him and Cohodes without consent.  For example, if Catalyst believed that Cohodes was making illegal trades or attempting to manipulate the securities market, then it stands to reason that Catalyst would pay a hefty sum for

1    information on Cohodes's next moves.

2        122.    The statements Snowdy made to Riley, Lutes, and Phillips were defamatory.

3    Riley, Lutes, and Phillips understood Snowdy's statements (1) to mean that Cohodes was

4    participating in illegal activities and (2) to damage Cohodes's reputation as an investor.

5        123.    Likewise, Snowdy's statements were unprivileged. The lawyers to whom Snowdy

6    made the statements were Catalyst's lawyers, not Snowdy's, and no privilege applies to

7    Snowdy's false statements.

8        124.    Guy's and Snowdy's statements to Glassman and to Catalyst's lawyers accused

9    Cohodes of committing a crime, and consequently constitute libel *per se*.

10        125.    At the time that Snowdy made these statements, he and Guy knew that Catalyst

11    was preparing to file lawsuits against investors claiming that those investors had illegally

12    manipulated the shares of Callidus. Consequently, Snowdy and Guy knew, or had reason to

13    know, that their false statements would likely be repeated in the litigation and disseminated to a

14    wider audience, which is what in fact occurred.

15        126.    As the direct and proximate result of Guy's and Snowdy's statements, Cohodes

16    has suffered injury to his professional reputation.

17        127.    Guy and Snowdy acted with malice, fraud, and oppression, such that Cohodes is

18    entitled to punitive damages.

**FOURTH CAUSE OF ACTION**
**False Light Invasion of Privacy**
**Against Defendants Snowdy and Guy**

21        128.    Plaintiff repeats and realleges paragraphs 1-127.

22        129.    The California Constitution guarantees the right to privacy. Cal. Const. art. I, § 1.

23    This right to privacy protects the citizens of California from, among other things, being

24    portrayed to other individuals in a false light.

25        130.    During his meetings with Catalyst's lawyers and executives, Snowdy repeatedly

26    asserted that Cohodes was involved in illegal market manipulation.

27        131.    For example, in his September 12, 2017 meeting, Snowdy claimed he had fed

1   Cohodes Concordia Healthcare's 2016 Q4 numbers with slight alterations.  Snowdy then stated

2   that, two days before those numbers were made public, Cohodes shorted Concordia's stock

3   based on the altered information Snowdy fed him.

4        132.   These statements by Snowdy were false or created a false impression about

5   Cohodes.  To start, Snowdy's statements falsely state or imply that Cohodes's investing strategy

6   relies on illegal market manipulation schemes or nonpublic information.  In reality, Cohodes has

7   long been a successful investor because, through careful analysis, he can identify companies that

8   are overvalued or may be conducting fraudulent or otherwise illegal activities.  Throughout his

9   career, Cohodes has worked with law enforcement to provide relevant information for

10  investigations.  And by playing some or all of a September 6, 2017 recording at the September

11  12, 2017 meeting, Snowdy intended to suggest that Cohodes improperly or unlawfully harassed

12  companies like Badger.  These implications were false.

13       133.   Snowdy's statements were understood by Catalyst's lawyers, executives, and

14  private investigators – Naomi Lutes, Jim Riley, John Phillips, and Peter Barakett – to imply that

15  Cohodes had no respect for the rule of law and that he was involved in illegal investing schemes,

16  including market manipulation and investing based on nonpublic information.

17       134.   Likewise, in the September 12, 2017 meeting Snowdy mischaracterized the actual

18  email communications between Cohodes and Levitt to falsely suggest that Cohodes was

19  manipulating the securities market and the whistleblower system.  Catalyst's investigators from

20  Black Cube believed and acted upon that mischaracterization.

21       135.   At the time that Snowdy made these statements, he and Guy knew that Catalyst

22  was preparing to file lawsuits against investors claiming that those investors had illegally

23  manipulated the shares of Callidus.  Consequently, Snowdy and Guy knew, or had reason to

24  know, that their false statements would likely be repeated in the litigation and disseminated to a

25  wider audience, which is what in fact occurred.

26       136.   As the direct and proximate result of Snowdy's statements, Cohodes has suffered

27  injury to his professional reputation.

28

137.   Guy and Snowdy acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

## Fifth CAUSE OF ACTION
### Trespass
### Against Defendant Snowdy

138.   Plaintiff repeats and realleges paragraphs 1-137.

139.   In 2016, Snowdy visited the home Cohodes owned in Sonoma County, California.

140.   Snowdy obtained Cohodes's consent to enter and remain on Cohodes's property by falsely holding himself out as a person who was adverse to Concordia and Concordia's CEO Thompson and aligned with Cohodes, when in fact Snowdy had been hired to spy on Cohodes and attempt to gather evidence that Cohodes was a criminal.

141.   Cohodes would not have allowed Snowdy to enter or remain on his property, but for Snowdy's material misrepresentations and omissions.

142.   As a direct result of the trespass, Snowdy was able to gain access to Cohodes and establish a relationship with him, which he then used to record Cohodes's phone calls and to obtain his emails, causing him further harm.

143.   Guy and Snowdy acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cohodes respectfully prays for judgment in his favor against Defendants MiMedx, Snowdy, and Guy as follows:

a.   Damages in the amount of $5,000 per violation of California Penal Code § 632.7;

b.   For all remedies specified in the Wiretap Act, 18 U.S.C. § 2520, including the sum of actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violations or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater;

c.   Compensatory damages according to proof at trial;

d.   Punitive damages in an amount sufficient to punish Defendants' wrongful conduct

1    and to deter future misconduct;

2   e.   The return of all documents, information, and data that Defendants unlawfully

3    obtained from Cohodes;

4   f.   Disgorgement of all sums that Snowdy obtained from Guy, MiMedx, or any other

5    person or entity as a result of his violations of Cohodes's rights;

6   g.   Permanent injunctive relief enjoining Defendant Snowdy from recording the

7    cellular or cordless telephone communications of Plaintiff Cohodes without the

8    consent of all parties to those communications;

9   h.   Permanent injunctive relief enjoining Defendant Guy or his agents from recording

10    the cellular or cordless telephone communications of Plaintiff Cohodes without the

11    consent of all parties to those communications;

12   i.   Permanent injunctive relief enjoining Defendant MiMedx from recording the

13    cellular or cordless telephone communications of Plaintiff Cohodes without the

14    consent of all parties to those communications;

15   j.   Costs and reasonable attorneys' fees incurred in this action; and

16   k.   Such other relief as the Court may deem just and proper.

17

18   Dated: January 19, 2022      Respectfully submitted,

19        THE NORTON LAW FIRM PC

20      By:   */s/ Fred Norton*

21        Fred Norton
Attorneys for Plaintiff

22        Marc Cohodes

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2      Pursuant to Civil Local Rule 3-6 and Federal Rule of Civil Procedure 38, Plaintiff Marc

3   Cohodes hereby demands a trial by a jury on all issues triable by a jury.

4

5   Dated: January 19, 2022                                    Respectfully submitted,

6                                                              THE NORTON LAW FIRM PC

7                                                    By:   */s/ Fred Norton*

8                                                          Fred Norton
                                                          Attorneys for Plaintiff
9                                                          MARC COHODES

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                                  )

27

28