# EXHIBIT A

1   FRED NORTON (CA SBN 224725)
    fnorton@nortonlaw.com
2   GIL WALTON (CA SBN 324133)
    gwalton@nortonlaw.com
3   LEAH JUDGE (CA SBN 302406)
    ljudge@nortonlaw.com
4   THE NORTON LAW FIRM PC
5   299 Third Street, Suite 200
    Oakland, CA 94607
6   Telephone: (510) 906-4900

7   Attorneys for Plaintiff

8   MARC COHODES

9

10                      UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12   MARC COHODES, an individual,            Case No. 3:22-cv-00368-RFL (KAW)

13                   Plaintiff,              **FIRST AMENDED COMPLAINT FOR**
                                             **DAMAGES AND INJUNCTIVE RELIEF**
14           v.

15   MIMEDX GROUP, INC., a Florida corporation,   DEMAND FOR JURY TRIAL
     DERRICK SNOWDY, an individual; DANIEL
16   GUY, an individual; and HARRINGTON
     GLOBAL OPPORTUNITIES FUND, LTD, a           **REDACTED**
17   Bermuda Corporation.

18                   Defendants.

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SUMMARY OF THE ACTION

1.      Plaintiff Marc Cohodes is a former hedge fund manager, a long-time stock market analyst, and a short seller.  Over his 40-year career as an investor and fund manager, Cohodes has exposed many publicly traded companies and individuals who were engaged in fraud, illegal conduct, questionable accounting, and stock manipulation, including Lernout & Hauspie, Media Vision Technology, NovaStar Financial, AremiSoft, California Micro Devices, Network Associates, TakeTwo Interactive, Krispy Kreme Donuts, Boston Chicken, MiMedx Group Inc., and others.  His successful investigations of fraud in the financial markets have been described and applauded in *The Wall Street Journal*, *The New York Times*, *Barron's*, *Bloomberg*, *Institutional Investor*, CNN, award-winning books about financial fraud, and two Harvard business cases, among others.

2.      Cohodes's success in exposing frauds has earned him enemies as well as accolades.  In this case, his enemies sought to retaliate against him by breaking the law – sending an unlicensed private investigator to befriend Cohodes on false pretenses, having the investigator illegally record Cohodes's phone calls, and then selectively disclosing, distorting, and misrepresenting Cohodes's phone calls, emails, and private conversations in an effort to damage his reputation and undermine his credibility with public securities markets and regulatory authorities in the United States and Canada.

3.      Derrick Snowdy is a private investigator who lied to Cohodes and Cohodes's acquaintances to gain access to Cohodes and learn information about Cohodes's business and his efforts to expose fraud, and then unlawfully recorded Cohodes's telephone conversations.

4.      Daniel Guy is the Chief Investment Officer, Director, and the sole owner of Harrington Global Opportunities Fund Ltd ("Harrington Global"), a hedge fund that lost money by investing in an overvalued company that Cohodes exposed.  Through Harrington Global and lawyer intermediaries, Guy hired Snowdy as a private investigator to assume false identities, conduct surveillance, and record phone calls of Guy's perceived enemies, including Cohodes.  Then, in the summer and fall of 2017, Guy and Snowdy tried to shop the illegal recordings and the improperly obtained information to yet another company, Callidus Capital, falsely claiming that Cohodes was part of a criminal conspiracy to manipulate Callidus's shares and launder money.  Cohodes was harmed by these actions, which invaded his privacy, damaged his reputation, and forced him to incur legal fees to investigate the scope of the

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

1  intrusions and to defend himself against false allegations of illegal behavior.

2      5.      After Callidus, Guy, Harrington Global, and Snowdy moved on to yet another publicly

3  traded company that had declared war on short sellers, MiMedx Group Inc.

4      6.      Cohodes had discovered in or around fall 2017 that MiMedx was engaged in fraudulent

5  accounting.  In response to Cohodes's warnings to the market, MiMedx engaged in a far-reaching

6  campaign to defame Cohodes, to discredit him, and to convince law enforcement that he, not MiMedx,

7  was engaged in criminal conduct.  Guy and Snowdy were aware of MiMedx's attacks on Cohodes and in

8  the fall or winter of 2017, Guy introduced Snowdy to MiMedx's executives and general counsel.  Just as

9  Guy had done, MiMedx retained Snowdy through lawyer intermediaries to continue to spy on Cohodes,

10 illegally record his phone calls, and obtain and disclose his private communications.

11     7.      While these illegal actions did cause Cohodes harm, they did not achieve MiMedx's

12 larger goals: ultimately MiMedx's chief executive officer, Parker Petit, and its chief operating officer,

13 William Taylor, were indicted for their multi-million-dollar scheme to inflate MiMedx's revenue, were

14 convicted in federal court, and were sentenced to prison.  MiMedx's audit committee concluded that the

15 company had to restate over five years of financial statements as materially false.  And an internal

16 investigation concluded that MiMedx and Petit had responded to internal employee concerns about

17 improper accounting by implementing a "secret video surveillance system" that recorded management

18 interviews of employees and those employees' discussions amongst themselves "without those

19 employees' knowledge or consent," and then used the improperly obtained recordings to retaliate against

20 whistleblowers and falsely accuse them of wrongdoing.

21     8.      From 2016 to 2020, Cohodes spoke on the phone with Snowdy hundreds of times.

22 Cohodes had no knowledge or suspicion of Snowdy's illegal recordings, or of Snowdy's, Guy's, and

23 MiMedx's illegal use of them, until May of 2021.  At that time, a Canadian court unsealed records that

24 revealed that Snowdy actually had been working for Guy, that he had been recording Cohodes's phone

25 calls, and that he and Guy had mischaracterized those recordings and Cohodes's other communications

26 to falsely accuse him of crimes.  In an email directed to attorneys involved in the unsealed Canadian

27 action, Snowdy admitted that he had a phone that automatically recorded all calls to that number; Guy

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

2

1  testified that Snowdy admitted "all" his calls were recorded.  Then, in August 2021, a hedge fund that

2  was suing MiMedx and its outside counsel persuaded a court to unseal records that MiMedx and its

3  counsel had produced in discovery, revealing for the first time that MiMedx had also hired Snowdy to

4  spy on Cohodes, obtain "drafts" of tweets and articles before they were published, and learn who

5  "participated on any calls, emails, or group messages" with Cohodes, along with other information that

6  could not be obtained through lawful means.

<strong><u>PARTIES</u></strong>

8      9.      Plaintiff Marc Cohodes is an individual who resides in Montana and is a citizen of

9  Montana.  At the time of the events that are relevant to this lawsuit, Cohodes resided in Sonoma County,

10  California and was a citizen of California.

11      10.      Defendant Derrick Snowdy is an individual who resides in Toronto, Ontario, Canada and

12  is a Canadian citizen.

13      11.      Defendant Daniel Guy is an individual who resides in Bermuda and is a Canadian citizen.

14      12.      Defendant Harrington Global Opportunities Fund, Ltd is a Bermuda Corporation.

15      13.      Defendant MiMedx Group Inc. is a corporation organized under the laws of Florida with

16  its principal place of business in Marietta, Georgia.

<strong><u>JURISDICTION AND VENUE</u></strong>

18      14.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this case involves

19  questions of federal law.

20      15.      The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the

21  action involves a dispute between citizens of different countries.  Plaintiff Cohodes is a resident and

22  citizen of Montana, Defendant MiMedx is a corporation incorporated in Florida with its principal place

23  of business in Georgia; Defendant Snowdy is a resident and citizen of Canada; Defendant Guy is a

24  resident of Bermuda and citizen of Canada; and Defendant Harrington Global is a corporation

25  incorporated in Bermuda with its principal place of business in Bermuda.  Therefore, complete diversity

26  of citizenship exists.  The amount in controversy, including the value of both monetary and injunctive

27  relief, and exclusive of interests and costs, exceeds the sum or value of $75,000.

28

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

3

16.     This Court has personal jurisdiction over Snowdy because, as part of the scheme to surveil Cohodes, Snowdy physically travelled to California and conducted business in the state by meeting with and surveilling Cohodes at his Sonoma, California home; by unlawfully recording multiple phone calls while Cohodes was in California; and by otherwise traveling to California to "infiltrate" a supposed conspiracy of stock manipulators, one of whom was purportedly Cohodes. His scheme targeted California and Cohodes's activities in California.

17.     This Court likewise has personal jurisdiction over Guy because Snowdy was at all relevant times acting as Guy's agent, including Snowdy's actions in and directed at California. Cohodes's claims arise out of Snowdy's surveillance and wiretapping of Cohodes in California, and Guy's collusion in efforts to defame and discredit Cohodes, who was at that time a California resident. Further, the Court has personal jurisdiction over Guy as a result of his substantial and continuing contacts with the state by engaging, in concert with Snowdy, in a sting operation in Santa Monica, California to attempt to obtain evidence of an alleged fraud perpetrated by third parties against Harrington Global. Further, the Court has personal jurisdiction over Guy as a result of his substantial and continuing contacts with the state through Harrington Global, which he controls and which is his alter ego.

18.     This Court likewise has personal jurisdiction over Harrington Global because Harrington Global (at Guy's direction, and through lawyer intermediaries) retained Snowdy to act as a private investigator in California, which included Snowdy's acts described above to surveil and wiretap Cohodes in California without his permission. Further, the Court has personal jurisdiction over Harrington Global as a result of its substantial and continuing contacts with the state, including the investment of tens of millions of dollars in a business located in Santa Monica, California; business meetings in California that Guy personally attended on behalf of Harrington Global; and Guy's and Snowdy's sting operation on behalf of Harrington Global in Santa Monica, in which they surreptitiously recorded an investor presentation and Snowdy pretended to be a prospective investor; and Harrington Global's commencement of litigation in California state court related to its California investments and the evidence that Snowdy and Guy obtained in their sting operation.

19.     Harrington Global and Guy are alter egos of one another. Harrington Global was at all relevant times formed, owned, operated, controlled, and dominated by Guy, was and is the alter ego of Guy and vice versa, was and is united in interest with Guy, was and is subject to Guy's effective direction and control, and was and is operated by Guy as his alter ego. In particular, Guy is the founder of Harrington Global. Guy is Harrington Global's Chief Investment Officer. Guy is Harrington Global's sole director. Guy is Harrington Global's sole owner. He makes all material decisions on behalf of the entity, uses and has used Harrington Global as a mere conduit for his own affairs, and uses and has used the corporation as a subterfuge for his own illegal acts.

20.     This Court also has personal jurisdiction over MiMedx because MiMedx engaged Snowdy to unlawfully spy on Cohodes in California and illegally record phone calls that Cohodes made in California. Further, at the time of the events in question, MiMedx was registered to do business in the State of California, and did do business in California. MiMedx had and has extensive and pervasive contacts with the State of California. According to its corporate website, it has held a California tissue bank license from the California Department of Public Health; it has conducted clinical education programs at medical facilities in California; it has sold its products directly to medical facilities in California; it has filed suit as a plaintiff in federal courts in California on claims arising from its commercial activities in the state and submitted to jurisdiction here; and it has full time employees working for the company in California.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## DIVISIONAL ASSIGNMENT

22.     Assignment to the San Francisco or Oakland Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the events or omissions giving rise to the claims occurred in Sonoma County.

## FACTUAL BACKGROUND

**A. Daniel Guy and Harrington Global Opportunity Fund's Failed Investment in Concordia Healthcare**

23.     In or around October 2015, Cohodes began building a "short" position in the Canadian

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

5

1  pharmaceutical company Concordia Healthcare.  Investors "short" a stock by borrowing a security and

2  selling it on the open market with the intention of buying it back later for less money, and then returning

3  it to the original lender.  Investors thus short a stock when they believe it is overvalued by the market

4  and its price will decline in the future.

5       24.    Cohodes was aware that Concordia's chief executive officer, Mark Thompson, had

6  previously been an executive at a different pharmaceutical company, Biovail, which had engaged in

7  significant accounting fraud and paid millions of dollars to settle claims by the Securities and Exchange

8  Commission.  Cohodes pointed out that the company incurred enormous debt to buy up companies and

9  prescription drugs that sold for modest amounts, with the goal of earning large profits by increasing the

10 price of these well-established drugs by 1000% or more.  If the company could not charge those inflated

11 prices, it would be unable to repay its substantial debt.  As Cohodes expected, increased awareness of

12 pharmaceutical price hikes led to heightened political scrutiny of drug prices and made business models

13 dependent on sizeable drug price increases, like Concordia Healthcare's, unsustainable.  Concordia's

14 Healthcare's business model was thus threatened, a particularly disastrous result given the company's

15 approximately $4 billion of debt.  In response to these events, Concordia Healthcare's share price

16 dropped precipitously.

17      25.    In June 2016, Concordia CEO Thompson sued Cohodes for defamation related to

18 Cohodes's criticisms of Thompson and Concordia.  Shortly thereafter, as reported in *The Wall Street*

19 *Journal*, the company reported significant asset write-downs, lowered its sales and profitability

20 projections, announced its finance chief would step down, and suspended its dividend.  Thompson

21 ultimately resigned from Concordia and agreed to dismiss his lawsuit against Cohodes, recovering

22 nothing.

23      26.    Daniel Guy is the Chief Investment Officer and a Director of Harrington Global

24 Opportunities Fund, a Bermuda-based hedge fund.  Unlike Cohodes, Guy failed to understand the flaws

25 in Concordia's business model.  At the time Cohodes began building his short position in Concordia,

26 Harrington Global owned approximately 2.7 million of the 51 million issued and outstanding common

27 shares of the company.  From its peak in June 2016, Concordia lost $3.9 billion in market capitalization,

28

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6

and by 2017, Harrington Global Opportunity Fund was forced to sell its shares of Concordia for a loss of approximately $150 million.

27.    Guy blamed short sellers for his bad investment. In an April 2018 email to the Ontario Securities Commission, Guy – still angered over his losses from the Concordia investment – threatened "a fucking war" if short sellers bet against another one of his companies.

**B. Daniel Guy and Harington Global Hired Derrick Snowdy to Spy on Guy's and Harrington's Perceived Enemies in California**

28.    Derrick Snowdy is a Canadian private investigator.

29.    In 2015, Guy caused Harrington Global to cause a Canadian attorney, John Kingman Phillips, to hire Snowdy as a private investigator on behalf of Guy and Harrington Global and to conduct activities in the state of California. Under the terms of the engagement, Snowdy was paid his expenses and a lump sum when he achieved certain results.

30.    Among other activities, Harrington Global, Guy, and Snowdy conducted an investigation into an investment that Guy had made, through Harrington Global and Salida Strategic Growth Fund Sarl – Harrington Global's predecessor company – in a company called StarClub. StarClub was based in Santa Monica, California. In an effort to demonstrate that the principals of StarClub had defrauded Harrington Global and Salida, Guy and Snowdy devised a scheme in which they traveled to California to conduct a sting operation. Guy introduced Snowdy (using a false name) as a potential investor in StarClub and attempted to elicit false statements about StarClub's business and prospects. Snowdy surreptitiously recorded the meeting, without the knowledge or consent of the other participants. Snowdy's investigation of StarClub in California on behalf of Harrington Global and Guy continued from 2015 through 2016 and into the latter part of 2017.

31.    While he was retained as a private investigator on behalf of Harrington Global and Guy, and in the course of that agency relationship, Snowdy also was attempting to establish a relationship with Cohodes. To do so, Snowdy began by introducing himself to members of the short seller community in California. In 2015 and 2016, Snowdy met with short seller Carson Block in San Francisco. Later in 2016, Snowdy pitched a story on Canadian National Railway to Roddy Boyd, a journalist for the Foundation for Financial Journalism and an acquaintance of Cohodes.

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

7

32.     Boyd agreed to take the Canadian National Railway story, and, as part of his research, reached out to Snowdy.  In 2016, Boyd travelled to Toronto and met with Snowdy.  In the course of that meeting, Snowdy asked Boyd for an introduction to Cohodes, and Boyd agreed to send an email introducing the two.  As part of his efforts to win Cohodes's trust, Snowdy falsely claimed that he was considering an engagement adverse to Concordia's Thompson and shared Cohodes's determination to expose liars and cheats.  In fact, at this time, Snowdy was actively engaged by Harrington Global and Guy, who had initiated a proceeding in Canada to obtain evidence about the purported manipulation of Concordia shares, and Concordia's defamation suit against Cohodes arising from Cohodes' critiques of Concordia and Thompson, was proceeding.  Snowdy would not have taken on an engagement adverse to Thompson and Concordia while simultaneously engaged by Guy and Harrington Global.

33.     As Snowdy had intended, Boyd relied on Snowdy's false representations and repeated them to Cohodes, who likewise relied on them as establishing that Snowdy was aligned with Cohodes with respect to Concordia and Guy.  The reality was the exact opposite.

34.     Sometime in late 2016, after Snowdy had been introduced to Cohodes, Snowdy – still acting as Guy's and Harrington Global's agent – travelled to Sonoma County, California, as part of the ongoing scheme to surveil Cohodes.  To ingratiate himself with Cohodes, Snowdy visited Cohodes at his home and sought to curry favor with Cohodes and Cohodes's family.  Snowdy thus used his trip to California to solidify his relationship with Cohodes, surveil him, and open a line of communication for later telephone calls.

35.     As Snowdy later told lawyers for Catalyst Capital Group Inc. – the investment firm involved in the Canadian litigation that was unsealed in 2021, revealing Snowdy and Guy's illicit scheme to surveil Cohodes – he took on an "undercover" role and "travelled to Los Angeles, San Francisco, Texas, New York City, and Florida over a one-year period and infiltrated the short sellers group."  At his deposition, Snowdy admitted that Phillips, the lawyer for Guy and Harrington Global, paid for at least some of his travel to California.

36.     On information and belief, Snowdy holds private investigator licenses from various Canadian provinces, but does not hold a private investigator license from California or any other U.S.

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

8

state.  Snowdy nonetheless engaged in the business of a private investigator, within the meaning of California Business & Professions Code § 7521, while in the State of California.  Snowdy thus violated California Business & Professions Code §§ 7520 and 7523(a).

37.     Snowdy obtained access to Cohodes through fraud and deceit.  In particular, Snowdy falsely represented to Boyd and to Cohodes that Snowdy was adverse to Concordia's Thompson and aligned with Cohodes, when in fact Snowdy was acting on behalf of Guy to try to prove that Cohodes had manipulated the stock of Concordia and other companies.

38.     Cohodes was unaware of Snowdy's betrayal.  At all times, Snowdy concealed from Cohodes his true employers and his true intentions in an effort to obtain access to Cohodes and information from Cohodes that Cohodes would not have provided had Snowdy told the truth.  Guy and Snowdy admitted at their depositions that, once Snowdy established contact with Cohodes and pretended to be Cohodes's friend, Snowdy disclosed to Guy information about Cohodes and the two men discussed Cohodes.

39.     In 2016, 2017, and 2018, Cohodes had scores of communications with Snowdy using Cohodes's cellular telephone, as well as communications by email and in person.  Cohodes would not have communicated with Snowdy at all had he been aware that Snowdy was working for Guy, that Snowdy was recording his phone calls, that Snowdy would disclose his emails, phone calls, and private conversations to adverse third parties, or that Snowdy was surveilling him.

40.     In fact, Snowdy recorded every single phone call he had with Cohodes, without Cohodes's knowledge or consent.  As Snowdy admitted at his deposition, he used two telephone numbers to communicate with Cohodes, one of which was configured to record every phone call made using it.  Snowdy also confessed to Boyd after the Canadian litigation documents were unsealed that one of Snowdy's phones was programmed with software to automatically record calls and store them on his home computer, in violation of the Canadian Criminal Code Section 191(1).  Moreover, Guy testified that at least as early as 2016, Snowdy told Guy that "all of his communications were recorded."

41.     Guy, Harrington Global, and Snowdy expressly and knowingly aimed their unlawful recording and other conduct at California, targeting and recording Cohodes where they both knew he

lived. Snowdy actually visited Cohodes at his Sonoma County home, contemporaneous news reports of Cohodes's shorting of Concordia and other Canadian companies frequently mentioned that Cohodes was from California, Guy himself collected and saved news articles about Cohodes that mentioned Cohodes's California residence, and in connection with his efforts on behalf of Guy in Canada, discussed below, Snowdy stated that he had taken an "an undercover (UC) role and allegedly travelled to Los Angeles, San Francisco, Texas, New York City and Florida over a one year period and infiltrated the short sellers group."

**C. Guy Admitted that Snowdy Was Guy's Agent Investigating Cohodes and Other Short Sellers**

42.     On August 11, 2017, Newton Glassman, the founder and managing partner of Catalyst, received an email claiming that Glassman had been targeted by a group of short sellers who sought to "bring down" Glassman and Callidus Capital Corporation, an asset-based lender in Catalyst's investment portfolio of which Glassman was CEO. The sender of the email used the pseudonym Vincent Hanna (the name of Al Pacino's character in the movie *Heat*) and an email address hosted by Runbox, a Norwegian email provider that advertises it can be forced to disclose subscriber identities only pursuant to an order from a Norwegian court.

43.     In subsequent litigation in Canada, a Managing Director and attorney for Catalyst named Jim Riley submitted a sworn declaration in which he affirmatively identified Guy as "Vincent Hanna." In particular, Riley stated the following, among other matters:

> On August 11, 2017, Newton Glassman received an unsolicited email from a person named "Vincent Hanna" (the "Vincent Hanna Email") …. The Vincent Hanna email described a "cabal" of companies and individuals that were engaged in illegal stock manipulation, whose goal was to "bring down" Callidus and Glassman by "acting in concert to short" Callidus' stock and spread false rumours in the marketplace.

> As I stated in my Affidavits sworn on May 29, 2020, I subsequently learned that "Vincent Hanna" is Danny Guy's alias. Guy is the founder of Harrington Global Limited, a private equity firm based in Toronto which had also been subject to an alleged short and distort attack. Collectively, Guy, Guy's lawyer John Kingman Phillips, and Guy's private investigator Derrick Snowdy will be referred to herein as the "Guy Parties".

> ***

> I personally communicated with Phillips and Derek [*sic*] Snowdy on several occasions; the context was that Snowdy had been introduced to me as an investigator retained by Danny Guy. I understand that Glassman also communicated with several of the Guy

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

10

Parties. The purpose of my communications with the Guy Parties was to share information about our common claims against certain short sellers.

44.    In his August 11 email as "Vincent Hanna," Guy asserted that the "RCMP [Royal Canadian Mounted Police] and FBI [United States Federal Bureau of Investigation] are aware of this 'cabal' from a criminal investigation but that doesn't help you in the short term." Guy then listed the investors that he claimed were involved, including Cohodes "and his huge global network." In the email exchange, Guy asserted that Cohodes, among others, was spreading false rumors in an effort to manipulate the publicly traded securities of Callidus and had hired private investigators to follow Glassman around.

45.    Guy's statements about Cohodes were false and misleading and were intended (1) to portray Cohodes as a market manipulator and "criminal" and (2) pique Glassman's interest in speaking to Snowdy or Guy. Guy had no factual basis to assert that Cohodes, a well-known and successful investor with a lengthy track record of identifying over-valued companies and companies engaged in fraud, was conspiring with other short sellers, was engaged in unlawful market manipulation, or was in any sense a "criminal." Moreover, Cohodes never took any short position in Callidus, as Snowdy and Guy well knew. In his efforts to elicit incriminating information from Cohodes for Guy's benefit, Snowdy had actually asked Cohodes about Callidus and Cohodes had truthfully informed Snowdy that he had no position in that stock.

46.    Over the course of the next few weeks in August 2017, "Vincent Hanna" (i.e., Guy) and Glassman communicated back and forth via email attempting to arrange an in-person meeting. Although Guy was eager to meet, Glassman insisted that Guy produce hard evidence or documentation of the purported scheme.

47.    On August 23, 2017, Guy – still masquerading as "Vincent Hanna" – participated in a conference call with Glassman, Riley, and two other Catalyst lawyers, Naomi Lutes and Brian Greenspan. According to Lutes's contemporaneous handwritten notes of this call, the call began with discussion of "how we [i.e., Catalyst] want to or can use their PI & limitations." In the margin next to this statement, Lutes wrote "PI = Derek." On the last page of her notes, at the very end, Lutes wrote, "PI = Derek Snowdy."

---

48.     During this August 23 call, Guy again falsely described Cohodes as a participant in the purported unlawful scheme to bring down Callidus.  Guy claimed that the decline of Concordia Healthcare was a "dry run" for the short sellers, and their next target was Valeant Pharmaceuticals, a Canadian drug company.  Guy asserted that the group of short sellers needed "big capital to take down Valeant" and suggested that they were working with the "Russian mob."  When questioned about the alleged Russian connection, Guy admitted that he "had no hard evidence" but claimed that "these guys talk about 'the big overseas guys in Hong Kong' as their money launderer," and said that from this he concluded that the connection was "Russian or Chinese."  Guy admitted that the source of this supposed information was his "PI."

49.     Guy's assertions that Cohodes was involved in an unlawful scheme to manipulate the shares of Valeant in coordination with the Russian mob or other "money launderers" were false and misleading.  Guy had no basis in fact to make those assertions.

50.     At the time Guy made these false statements, he also knew that Catalyst was planning to file a lawsuit against the short sellers and others that were supposedly manipulating Callidus's securities.  Neither Guy nor Harrington Global was a party to those legal proceedings and neither had any intention to become a party.  They were not petitioning any tribunal, regulator, or law enforcement agency.  Rather, they were feeding false information to Glassman and Catalyst knowing that those false statements would be repeated to a much larger audience of market participants, attorneys, investigators, and Canadian law enforcement agencies.

**D. Guy Admitted that Snowdy Was Guy's Agent Investigating Cohodes and Other Short Sellers**

51.     Immediately following the August 23 conference call, Guy and Glassman began communicating through WhatsApp, an instant messaging service.  Guy has admitted at his deposition that he sent the WhatsApp messages attributed to him in the exchange, which is attached as **Exhibit A** to this First Amended Complaint.

52.     In his messages with Glassman, Guy claimed that his investigation with Snowdy was penetrating "the wolf pack" – their name for Cohodes and the group of short sellers – and that Snowdy was on the "inside."  Guy's WhatsApp messages made clear that Snowdy was the private investigator

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12

and agent for Guy and Harrington Global who had been engaged to spy on Cohodes in California as well as other short sellers, including by obtaining tapes of their communications and their emails.  For example,

     a.    On August 23, 2017, Guy wrote to Glassman, stating, "I think you should meet with **the PI** and hire him.  He will deliver tapes and emails etc."  At his deposition, Guy admitted that his reference to "the PI" was a reference to Snowdy, and that Snowdy had told him that "his lines are recorded."

     b.    On August 24, 2017, Guy wrote to Glassman, stating "Jim and/or you are best to meet with **our guy**."  The refence to "our guy" was a reference to Snowdy.

     c.    On August 24, 2017, Guy wrote to Glassman, stating, "**Our guy** was involved in conversation with Anson."  The refence to "Our guy" was a reference to Snowdy.

     d.    On August 26, 2017, Guy wrote to Glassman, stating, "Forget other PI's meet him and John with your lawyers and Riley …."  At his deposition, Guy admitted that his reference to "him" was a reference to Snowdy and the reference to "John" was a reference to John Kingman Phillips.

     e.    On August 26, 2017, Guy wrote to Glassman, stating, "**My guy** is at risk so I don't blame him for being cautious."  The refence to "My guy" was a reference to Snowdy.

     f.    On August 26, 2017, Guy wrote to Glassman, stating, "**My guy** had a history with one of your guys …."  The refence to "My guy" was a reference to Snowdy.

     g.    On August 26, 2017, Guy wrote to Glassman and pasted in the chat a lengthy message "From **my guy**," directed to John Kingman Phillips, the attorney who had engaged Snowdy on behalf of Harington Global and Guy.  At his deposition, Guy admitted that his reference to "my guy" was a reference to Snowdy.  The message from Snowdy that Guy pasted into the chat falsely asserts that "Cohodes" was one of the people who were part of an "overall scheme to target Calladus [*sic*]" and Glassman.  Snowdy concluded his message to Phillips with the statement, "***I will defer to your direction on any further cooperation or discussion on this file.***" (Emphasis added.)

     h.    On August 26, 2017, Guy wrote to Glassman, stating, "**My guy** gets shit done." At his deposition, Guy admitted that his reference to "My guy" was a reference to Snowdy.

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13

1    i.  On August 26, 2017, Guy wrote to Glassman, stating, "**This guy** can do more for

2 your case then 5 of those other guys. With both past info and ongoing operations. Gimme a few days to

3 fix it. What do you want as a act of good faith on our side? I will get it. There are two things from what I

4 see. All the past info. Meetings, conversations etc and then ongoing info **from within the wolf pack**.

5 Done right we can do something good. Would **my guy** want to get paid for ongoing operations. Yes of

6 course." At his deposition, Guy admitted that his references to "This guy" and "my guy" were

7 references to Snowdy. Guy also admitted that the reference to the "wolf pack" was a reference to the

8 short sellers, including Cohodes, whom Guy suspected were manipulating Callidus stock.

9    j.  On August 28, 2017, Guy wrote to Glassman, stating, "Now **my guy** still has a

10 good relationship with these pricks if you want to get him wired up to get more Calladus [*sic*] specific

11 stuff that can be done."   The refence to "my guy" was a reference to Snowdy.

12    k.  On August 28, 2017, Guy wrote to Glassman, "Yes **he** has tapped conversations

13 and tons of emails. We will get them to you as soon as practical." At his deposition, Guy admitted that

14 his reference to "he" was a reference to Snowdy and that when he wrote "tapped" "I'm sure it meant

15 taped" by which he meant "recorded" conversations.

16    l.  On September 5, 2017, Guy wrote to Glassman, stating, "If we do this. **My guy**

17 who is still inside may become useless. Would you not want him to get more info Taped [*sic*]

18 conversation etc." At his deposition, Guy admitted that his reference to "My guy" was a reference to

19 Snowdy, and that his reference to "inside" meant inside a group of people who were destroying

20 Canadian companies and that included Cohodes.

21    m.  On September 12, 2017, Guy wrote to Glassman, writing, "Didn't **he** show Jim

22 and [*sic*] email from Cohodes from Lloyd the lawyer saying he wanted to pass on info on your

23 company??" At his deposition, Guy admitted that his reference to "he" was a reference to Snowdy, and

24 the reference to "Cohodes" was a reference to Marc Cohodes.

25    n.  On October 3, 2017, Guy wrote to Glassman, "What would u have me do ? **He**

26 has two years of stuff. Tapes emails etc." At his deposition, Guy admitted that his reference to "he" was

27 a reference to Snowdy. Guy also admitted that the two-year time period he was referring to was the

28

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

14

1  same two-year period when Snowdy "was working for Harrington Global Opportunity Fund on the

2  StarClub investigation."

3         o.    On October 5, 2017, Glassman wrote to Guy, "For 25k at most U could have

4  locked **him** up and owned all his info for the indefinite future." Guy responded, "Paid **him** way more

5  than that." At his deposition, Guy admitted that Glassman's reference and Guy's reference to "him"

6  were both references to Snowdy.

7         p.    On October 8, 2017, Guy wrote to Glassman, "**He** told me **he** gave u the email

8  and is in email contact with Naomi. Showed me the emails." At his deposition, Guy admitted that his

9  references to "he" were references to Snowdy.

10         q.    On November 9, 2017, Guy wrote to Glassman, stating, "they used **my guy** for

11  strategy on nobilis so not Strange [*sic*] request." At his deposition, Guy admitted that his reference to

12  "my guy" was a reference to Snowdy.

13         r.    On November 9, 2017, Guy wrote to Glassman, stating, "Anson reached out to

14  **my guy** to meet when Suni Puri is back in a week. I think he may be overseas with Cohodes. Now I

15  would pay **my guy** to tape all those conversations." At his deposition, Guy admitted that his reference

16  to "my guy" was a reference to Snowdy.

17  **E.  Snowdy Boasted That He Recorded Numerous Telephone Conversations with Cohodes on Behalf of Guy and Harrington Global**

18  

19         53.    In addition to Guy's relentless promotion of Snowdy and his illegal recordings, Snowdy

19  himself repeatedly stated that he had recorded his phone calls with Cohodes.

20         54.    On August 23, 2017, Guy messaged Glassman, "I think you should meet with the PI and

21  hire him. He will deliver tapes and emails etc." As Guy admitted at deposition, the "PI" Guy was

22  referring to was Snowdy.

23         55.    Guy arranged for Snowdy to meet with two private investigators working for Catalyst –

24  Peter Barakett and Tom Klatt – on or about August 26, 2017. In that meeting, Snowdy represented that

25  Guy was paying him $25,000 per month plus expenses for his services. Snowdy was also asked whether

26  he had any recordings of his conversations with the short sellers he was surveilling. Snowdy responded

27  that he had "tons" of recordings, including tapes of conversations with Cohodes.

28  

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

15

56.     Following the meeting, Glassman told Guy that Glassman's representatives had concluded that Snowdy had no new or "actionable" information.  (In his communications with Guy, Glassman used the term "actionable" to refer to information that was lawfully obtained.)  In a series of WhatsApp messages with Guy on August 26, Glassman mentioned that Snowdy had alluded to recordings, but that they were not played in the meeting.  Glassman stated that unless Snowdy was able to affirmatively prove that he had information of value, Catalyst and its team would have nothing to do with him.

57.     Over the course of the following weeks, Guy repeatedly assured Glassman that Snowdy had taped conversations with short sellers, including Cohodes.  For example, on August 28, 2017, Guy wrote to Glassman, "Yes he [Snowdy] has tapped [*sic*] conversations and tons of emails."

58.     On August 30, 2017, Guy – using his own name and his Harrington Global email address – once again expressly confirmed that Snowdy was working for Guy and Harrington Global to spy on Cohodes in California along with other short sellers.  On that day, Snowdy emailed John Kingman Phillips, using the same email address he had used to communicate with Cohodes, jdsnowdy@interlog.com.  Snowdy wrote (emphasis added):

> With respect to our conversation on Monday I have reviewed the relevant time frame. With respect to issues pertaining to Callidus and in particular Mr. Glassman we have two months in which they were relevant topics.
>
> **In February when I attended the meeting with APC arranged by MC in California Catalyst/Callidus was the sole topic of discussion**. In that meeting I was asked to initiate an investigation into recruiting inside sources and obtaining information/documents. **Two weeks later at the follow up meeting (which was recorded as the first meeting failed to record)** AS from APC seemed hesitant and suspicious. He wanted to change the subject and passed me a written not saying that needed to talk outside the office about anything Catalyst/Callidus related. He appeared surveillance concious [*sic*].
>
> In April APC expressed interest in connecting a company called Storage Vault to Catalyst/Callidus and in any relationship that may exist with Steven Muzzo.  I was later given a document relevant to **the Harrington investigation** on a USB device provided by APC. I recovered deleted files from that USB device and found dozens of files related to Storage Vault. It appears that they are pursuing that narrative on their own at this point. With the Storage Vault narrative their plan includes making allegations of fraud related to transactions. I understand that currently a narrative similar to the one APC was constructing is being used to advance a complaint of fraud against

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

16

Cataylst/Callidus. There was no benefit to the ongoing investigation to pursue these issues.

**There would be no work product that would benefit Harrington.** The relationship with APC et al remains strong at present and can be exploited.

As we never pursed these topics with the cabal we did not develope [*sic*] or obtain specifics related to their interest. **At present I do have the opportunity to insert myself in a collaborative manner with this group on a regular basis to work with them.** The value of that is something that needs to be determined by those involved.

59.    The email thus makes clear that Snowdy was investigating short sellers, one of whom was Cohodes ("MC"), in California, on behalf of "Harrington." (Snowdy's assertion that he had been asked by Cohodes to "initiate an investigation into recruiting inside sources and obtaining information/documents" related to Catalyst and Callidus was false.)

60.    For his part, Guy adopted Snowdy's email and his description of the work he was doing for Harrington Global. Snowdy forwarded that email to the email address danny@harringtongloballtd.com (Guy's professional email address at Harrington Global). Guy then forwarded the email to Glassman without disputing or correcting any aspect of Snowdy's email.

61.    In response, Glassman once again asked for Snowdy's recordings and wrote, "I sense your pi wants us to hire him and he would go inside. Good idea but we r not doing so wout [*sic*] proof of his bona fides." Guy never disputed the characterization of Snowdy as "your pi." Instead, he responded to Glassman, "Let me get you what you need so you get comfort then you can decide from there."

62.    By September 2017, Guy had secured Snowdy a second and third meeting with the Catalyst parties. On September 12, 2017, Snowdy met with John Kingman Phillips and lawyers for Catalyst, including Jim Riley and Naomi Lutes. On September 18, 2017, Snowdy met again with Lutes and Riley. Lutes took notes of both meetings.

63.    In the course of the September 12 meeting, Snowdy yet again confirmed that he was working for Harrington Global and Guy to spy on short sellers, including Cohodes. Lutes's notes of the September 12 meeting include the following statement (bracketed text in original): "Danny [client X] had said, with respect to the cabal, that he was thinking of reaching out to Newton, and asked whether

1   Snowdy was able to re-insert himself [this is presumably in and after February 2017]. Snowdy

2   responded 'yes, they are always bugging me about stuff, but it won't help you with Concordia.'"

3         64.    In the September 12 meeting, Snowdy repeatedly bragged about recordings of

4   conversations he had with various individuals, and he ultimately played a recording of what Snowdy

5   represented was a September 6, 2017 telephone call between Cohodes and Snowdy. According to

6   Lutes's notes, on the recording Cohodes said (among other things) that he would be attending a

7   conference in October and wanted Snowdy to be there. In fact, Cohodes did attend the Grant's Interest

8   Rate Observer Conference in October 2017 and he had invited Snowdy to attend the conference with

9   him. Lutes had no way to know this except through the illegal recording, which thus confirms its

10  authenticity. Cohodes had not been aware that Snowdy was recording that call or any other call, and he

11  did not consent to recording.

12        65.    On September 6, 2017, Cohodes was in California.

13        66.    September 2017 is also during the period in which Guy, Harrington Global, and Snowdy

14  were attempting to persuade Glassman to use the tapes, emails, and other information that Snowdy had

15  previously obtained, and to retain Snowdy to record more of Cohodes's phone calls.

16        67.    Also in this September 12 meeting, Snowdy made a number of false statements about

17  Cohodes:

18          a.    Snowdy claimed that he had provided Cohodes with Concordia Healthcare's 2016

19  Q4 numbers with slight alterations. Snowdy then stated that, two days before Concordia's Q4 numbers

20  were made public, Cohodes shorted Concordia's stock based on the information Snowdy fed him.

21  Snowdy also claimed that Cohodes was receiving information about Catalyst "from the inside."

22  Snowdy's statements that Cohodes traded on information that Cohodes believed to be inside Concordia

23  information were false and misleading and were made to paint Cohodes as a market manipulator.

24  Snowdy had no basis for these allegations and knew his statements were false at the time he made them.

25          b.    Snowdy falsely claimed that Adam Spears and Sunny Puri of Anson Funds, a

26  Canadian investment firm, regarded Cohodes as "their boss" and alleged that "the Anson guys" had

27  engaged in market manipulation or other unlawful schemes such as soliciting insider information,

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

18

1  planning to "infiltrate Callidus / Catalyst" to "get dirt or develop sources," and coordinating a "short

2  attack" on a public Canadian company called Badger Daylighting.  Snowdy also claimed that Anson

3  managed some of Cohodes's money.  At the same time, Snowdy also linked Anson to allegations that

4  the firm had manipulated the securities of Callidus.  Thus, Snowdy's statements falsely portrayed

5  Cohodes as involved in an unlawful conspiracy to manipulate securities.  In fact, Anson did not manage

6  any of Cohodes's money; Cohodes was not the "boss" of Spears, Puri, or anyone else at Anson, and

7  gave no one at Anson any reason to think of him that way; he did not direct or control the activities of

8  anyone at Anson; he did not coordinate a so-called "short attack" on Badger Daylighting; he did not

9  manipulate the shares of Callidus; and he did not even have a short position in Callidus and had told

10 Snowdy as much.  Snowdy had no basis for these allegations and knew his statements were false at the

11 time he made them.

12         c.       During the August 26, 2017 meeting, Snowdy claimed that the cabal of short

13 sellers had set up 65 separate Twitter accounts that they would use to coordinate messages at the same

14 time without being connected to one another.  During the September 12, 2017 meeting, Snowdy

15 elaborated that he had analyzed data that Guy had purchased from Twitter "in furtherance of their own

16 [Danny] investigation" (brackets in original) in order to investigate the alleged manipulation of

17 Concordia stock, and had discovered that "[o]ne night, Cohodes/ the cabal screwed up and all the

18 accounts tweeted the same thing at the same time about a telecom company in Sweden."  These

19 statements – alleging that Cohodes was involved with a group of short sellers who were conspiring to

20 send out negative information to manipulate public traded securities – were false and once again falsely

21 portrayed Cohodes as engaged in unlawful market manipulation.  Snowdy had no basis to make these

22 statements with respect to Cohodes, and knew he had no basis for those statements when he made them.

23         d.       Snowdy falsely asserted that Cohodes was a "puppet master" of the cabal and

24 falsely suggested that Cohodes had relationships with unnamed persons in "Hong Kong, Europe, [and]

25 the Caribbean" that were used for "money laundering and/or the facilitation of exit cash from Asia."

26 These statements falsely accused Cohodes of being engaged in crimes, specifically conspiracy to

27 manipulate securities markets and money laundering.  Snowdy had no basis to make these statements

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

19

1  about Cohodes, and knew he had no basis for those statements when he made them.

2          e.      During the September 18, 2017 meeting, Snowdy falsely claimed that he had an

3  "ongoing relationship" with the United States Department of Justice and falsely claimed that "they are

4  running a large tax evasion investigation" in which "Cohodes's name is 2nd on [the] list." To this day,

5  Cohodes is unaware of any "tax evasion" investigation of him. As a prominent critic of companies

6  engaged in accounting fraud and securities law violations, Cohodes has frequently been in contact with

7  U.S. enforcement authorities to report both suspected criminal behavior and violations of civil laws. At

8  no time has any enforcement authority ever suggested to him that he was the subject of a "tax evasion

9  investigation." Snowdy had no basis to make these statements about Cohodes, and knew he had no

10 basis for those statements when he made them.

11         68.     All of these statements about Cohodes were false when made. Snowdy had no

12 reasonable basis in fact to make those statements. To the contrary, they were fabrications by Snowdy

13 for the purpose of continuing his lucrative relationship with Guy, insinuating himself with Glassman's

14 advisors, and attempting to establish his own credibility as an effective investigator.

15         69.     At the time that Snowdy made these false statements, he and Guy also knew that Catalyst

16 was planning to file a lawsuit against the short sellers and others that were supposedly manipulating its

17 securities. As a result, Guy and Snowdy knew, or had reason to know, that the false statements that

18 Snowdy made to Catalyst and its lawyers would be repeated to a much larger audience of market

19 participants, attorneys, investigators, and Canadian law enforcement agencies.

20         70.     After the September meetings, Glassman messaged Guy that Snowdy needed to

21 substantiate every allegation he had made. In response, in his October 3, 2017 WhatsApp message to

22 Glassman, Guy claimed that Snowdy had "two years of stuff. Tapes emails etc." Guy also insisted that

23 Snowdy had a valuable email between Cohodes and Canadian attorney Darryl Levitt discussing Catalyst

24 and Callidus, but Glassman indicated that he already had that document.

25         71.     In fact, Snowdy did disclose that email to Catalyst. In the subsequent Canadian litigation

26 between Catalyst and short sellers it sued, the short sellers alleged that the Catalyst parties had obtained

27 this email through illegal hacking. The Catalyst parties responded by asserting in a court filing in May

28

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

20

1  2021 that, in fact, "a copy of the email was obtained from Derrick Snowdy who obtained it from

2  Cohodes." Thus it is confirmed that Snowdy did obtain Cohodes's emails and disclose them to Catalyst.

3  Further, although Glassman told Guy he had doubts about the credibility and quality of Snowdy's

4  information, he later admitted at a deposition in May 2021 that he made those statements to "put

5  pressure" on Guy in the hopes of getting the tapes that Snowdy promised.

6       72.    Likewise, internal communications that were unsealed in the Catalyst Canadian litigation

7  in May 2021 revealed that Glassman and his lawyers did credit the false and defamatory information

8  that Guy and Snowdy fed them. For example, a September 13, 2017 chat message sent by a member of

9  Catalyst's investigation firm, Black Cube, contained the following statement (typos and misspellings in

10  original):

> Jim and Naomi (Brian's jr lawyer) just finished a mtng w a 'source'- Vincent Hanna's pi.
> I have asked that Naomi's hand written notes be fwded to u asap and followed up when
> typed up. 2 of the important 'facts' that need to be chased down: 1. 'Levitt', one of the
> fortress principals and a former norton rose lawyer, allegedly wrote an email to cohodes
> asking for direction etc on how to manipulate/ use the whistleblower pgm and other
> 'advice'. Jim literally saw the emails on snowdy's computer. This is unequivocal proof of
> both conspiracy AND intent to manipulate BOTH the mkt (criminal) and abuse he
> whistleblower system (quasi-criminal). This is very serious and very valuable to us. 2.
> Snowdy alleges he has proof cohedes has chinese backing/$. If we find out who it is and
> sick the chinese backers on cohedes, that could be a good fact for us. Snowdy also alleges
> anson partners Canada are the most dirty of the Wolfpack. If prove that and connection to
> west face, very helpful.

17       73.    While Cohodes did in fact email with Levitt, they did not in any way discuss

18  manipulating the market or the whistleblower system, and Snowdy's characterization of the email he

19  improperly disclosed was false and misleading. Likewise, Snowdy's claim that Cohodes had "Chinese

20  backing/$" was false. But Catalyst and its attorneys and investigators credited Snowdy's smears of

21  Cohodes and acted on them.

22       74.    Guy continued to press Glassman that Snowdy was still working for Guy and could be

23  useful. For example, on November 9, 2017, Guy messaged Glassman that "Anson reached out to my

24  guy to meet when Suni [sic] Puri is back in a week. I think he may be overseas with Cohodes. Now I

25  would pay my guy to tape all these conversations." Glassman declined.

26       75.    Although Snowdy and Guy had every incentive to prove their claims about Cohodes, they

27  never did so.

**F.  Unsealed Documents in Canadian Litigation Revealed Snowdy and Guy's Surveillance of Cohodes**

76.     While Guy was attempting to pitch Snowdy and the short-seller investigation to Glassman, Glassman and Catalyst were involved in a series of lawsuits in Canada.  In 2017, Catalyst sued a number of hedge fund managers and journalists for defamation.  At the center of the litigation was an article published in the Wall Street Journal alleging that Catalyst was engaged in criminal or fraudulent activities and was under investigation for those activities.  Catalyst's lawsuit alleged that a group of short sellers requested publication of the article to attack Catalyst.  Catalyst's lawsuit resulted in a series of other Canadian lawsuits.

77.     During these lawsuits, discovery uncovered a mass of documents related to Cohodes, Guy, and Snowdy.  Among these were the WhatsApp messages between Glassman and Guy discussing Snowdy's investigation into Cohodes; lawyer's notes summarizing the August 23, 2017 meeting with "Vincent Hanna" and Catalyst; investigator's notes summarizing the August 26, 2017 meeting between Snowdy and Catalyst; and lawyer's notes summarizing the September 12, 2017 and September 18, 2017 meetings between Snowdy and Catalyst, in which Snowdy played a recording of one of his calls with Cohodes and defamed Cohodes, all as described above.

78.     These records were unavailable to Cohodes or the public until May 2021, when the Ontario Superior Court of Justice unsealed the documents.  Indeed, the Catalyst parties actively resisted disclosure of the documents and argued that they were subject to privilege under Canadian law, an argument that the Canadian court rejected in ordering them disclosed and unsealed.

79.     Once the documents were unsealed, Cohodes discovered that Guy had hired Snowdy as his agent to surveil and investigate Cohodes and other short sellers.  Cohodes likewise discovered that Snowdy, acting as Guy's agent, had recorded their cellular or cordless telephone communications in both 2016 and 2017 without his consent.  Through jurisdictional discovery in this case, Cohodes learned that Guy and Harrington Global are alter egos of one another and that Guy used Harrington Global to retain Snowdy through outside lawyers.  Before that time, there was nothing Cohodes could have reasonably done to discover that Guy and Harrington Global had hired Snowdy as their investigator or that his calls with Snowdy were being recorded.

### G. MiMedx Also Hired Snowdy to Spy on Cohodes

80.     Around September 2017, Cohodes began to follow allegations about improprieties at MiMedx Group, Inc., a publicly traded company that processes, markets, and distributes medical products. Cohodes became a vocal critic of MiMedx based on his assessment of the company's publicly reported financial results and his doubts about the effectiveness of the company's products, among other concerns. He ultimately concluded that MiMedx had (a) paid doctors to tout MiMedx's products without disclosing the payments; (b) shipped products to entities that did not pay for the product but instead relied on MiMedx to sell that product (also called "channel stuffing"); and (c) directed and encouraged customers of MiMedx products to use incorrect billing codes when billing government entities to increase government reimbursements, and then shared the proceeds with the entities or individuals who miscoded the reimbursement forms.

81.     Cohodes published his criticisms of MiMedx using a Twitter account that identifies him by name and a website he had set up to document questionable accounting and sales practices at MiMedx.

82.     Around this same time, the summer or fall of 2017, an anonymous blogger operating under the pseudonym "Aurelius Value" posted an article about MiMedx describing ongoing fraud at the company. Shortly after Aurelius published the article, MiMedx published a press release claiming that Aurelius Value's claims were false. In that article, MiMedx conceded that it did not know the identity of Aurelius Value, but it promised to hold the unknown blogger "accountable." (Cohodes is not Aurelius Value and had nothing to do with the article.)

83.     On October 4, 2017, MiMedx filed a lawsuit against Sparrow Fund Management LP, a New York hedge fund manager and investment advisory firm. MiMedx alleged, among other things, that partners at Sparrow were blogging under the name Aurelius Value and were trying to manipulate the price of MiMedx shares. Ultimately, MiMedx conceded that neither Sparrow nor its principals were Aurelius Value, and MiMedx dismissed its lawsuit. Sparrow responded by suing MiMedx for malicious prosecution in federal court in New York and sued MiMedx's outside counsel in Los Angeles Superior Court.

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

23

84.     Documents from the Sparrow-MiMedx litigation, first revealed to Cohodes when they were made public in August 2021, confirm that MiMedx either approached, or was approached by, Snowdy to try to demonstrate a connection between Sparrow, Cohodes, and Aurelius Value, and that Guy touted the illegal work Snowdy had done for Guy to convince MiMedx to hire Snowdy.  For example, a February 2018 invoice from the investigation firm Mintz Group, detailing work that Mintz performed on behalf of MiMedx in mid-December 2017, reports that the firm at that time "[c]onducted online, press and social media searches for Danny Guy to determine his background; searched for Guy's involvement with Concordia; reviewed Cohodes's tweets targeting Concordia; . . . searched for social media accounts belonging to Snowdy; reviewed Snowdy's Twitter profile and interactions with Cohodes; . . . [c]onducted press research on Derrick Snowdy and wrote update on him."  Mintz investigators also billed for time spent on "several conferences with investigators on Anson, Guy and Snowdy findings."

85.     In fact, Snowdy took advantage of his illicitly obtained recordings and shopped the information around to potential customers – companies like MiMedx that wished to surveil Cohodes.

86.     By October 2017, Guy, Harrington Global, and Snowdy were well aware of efforts by Cohodes and other short sellers to expose MiMedx's fraud.  For example, on October 8, 2017, Guy sent Glassman a WhatsApp message with an attached file titled "MiMedx Exposes False, Misleading and Fabricated Allegations by Short Sellers Final.pdf."  This attack on short sellers originally appeared on the official MiMedx website at www.mimedx.com/content/short-selling-commentary (no longer available) and was first published on or about September 29, 2017.  At his deposition, Guy admitted he sent that message and attachment because he believed that short seller attacks on MiMedx followed the same patterns as the supposed short seller attacks on Callidus.

87.     On October 24, 2017, a person using an anonymized email and calling themselves "an MDXG friend" wrote to MiMedx executives.  The email stated that MiMedx was "on the right track" in its lawsuit and purported to identify "criminal short sellers" who were part of the "MDXG cabal" and who "worked closely with Marc Cohodes."  (MDXG is the stock ticker symbol for MiMedx.)  MiMedx then provided this anonymous smear to the United States Department of Justice in an effort to shift

1   attention away from its own misconduct and onto Cohodes. Cohodes obtained a heavily redacted copy

2   of this email in response to a Freedom of Information Act request. The copy that was produced to him

3   redacts the email address of the sender and recipients, and all names other than his own.[1] On

4   information and belief, the anonymous email to MiMedx was sent by Snowdy, by Guy, or by one of

5   Guy's agents but in any event Snowdy and Guy were acting as co-conspirators.

6       88.   ███████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████

12      89.   Snowdy later stated that around December 2017, he attended a meeting that included

13  representatives of both MiMedx and Guy, specifically MiMedx CEO Petit; David M. Pernini (an

14  attorney at Wargo French, a law firm that was then outside counsel to MiMedx in its litigation against

15  short sellers and employee whistleblowers); Ed Borkowski, formerly the CFO of Concordia, who

16  became executive vice president and interim finance chief of MiMedx in spring 2018, and an

17  unidentified lawyer for one of Guy's companies. At his deposition, Snowdy admitted that he had

18  attended such a meeting at MiMedx's headquarters in Georgia around Christmas 2017.

19      90.   The unlawful conspiracy of Harrington Global, Guy, Snowdy, and MiMedx had

20  immediate effect. MiMedx escalated with personal attacks on Cohodes in an effort to discredit him and

21  distract the market and regulators from MiMedx's criminal conduct. On the main page of its corporate

22  website, www.mimedx.com, the company included a link to "Short Selling Commentary" that posted

23  numerous articles directly attacking Cohodes, including posts by MiMedx and Petit on October 24,

24  October 27, October 30, November 2, December 14, and December 28, 2017.

25      91.   Snowdy was successful in pitching his services to MiMedx. On January 15, 2018,

26

---

27  [1] Although MiMedx possesses the unredacted original and Cohodes sought its production, MiMedx has
    unreasonably refused to produce that document, continuing to conceal the identity of those who defamed
28  and maligned Cohodes.

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Pernini emailed Snowdy and copied Lexi Haden, then general counsel of MiMedx.  Pernini confirmed that "[w]e received your signed copy of the engagement agreement" and set forth in detail "the general objectives of MiMedx for the engagement."  Pernini's list of objectives made clear that he and MiMedx expected that Snowdy had, or could obtain, access to Cohodes's emails, phone calls, tweets, and other confidential information.  For example, Pernini's list of MiMedx objectives included:

      a.    obtaining "advanced notice of any upcoming attacks or damaging articles or tweets on MiMedx";

      b.    getting "drafts of articles (or tweets)" in advance;

      c.    learning who "participated on any calls, emails, or group messages" with Cohodes that concerned MiMedx:

      d.    learning "who is the money behind Cohodes";

      e.    learning whether "Cohodes is being paid for his actions";

      f.    learning whether current or former employees of MiMedx had been in contact with Cohodes, and obtaining "a list of employees that Cohodes and others are targeting for information";

      g.    investigating "any other evidence of illegal activity by Cohodes, such as front running, naked shorting, money laundering, etc."

92.    A copy of Pernini's January 15, 2018, email to Snowdy is attached hereto as **Exhibit B**.  This document was retrieved from a publicly available court filing.

93.    At the time that Pernini engaged Snowdy on behalf of MiMedx, Snowdy was not licensed as a private investigator in any U.S. state.

94.    On January 19, 2018, Pernini followed up with another email to Snowdy, stating that he had received a voicemail from Snowdy and adding an additional "objective" to Snowdy's engagement.

95.    On January 26, 2018, not long after MiMedx had retained Snowdy to spy on Cohodes, MiMedx CEO Petit published a post titled "Cohodes' Illegal Selling Operations."  The article mimicked some of the false and defamatory allegations that Snowdy and Guy had made against Cohodes in Canada just weeks before.  For example, MiMedx's post stated:

      a.    "We believe Marc Cohodes and his cabal orchestrate and participate in illegal

short selling attacks . . . .”

    b. “In MiMedx's case, we believe Cohodes is probably being paid by certain hedge funds that have developed substantial losses over the years by short selling the Company.”

    c. Cohodes had one of his “publication shills” write a “fraudulent memo” purportedly by a former MiMedx employee and then circulated it to major media sources and regulators.

  96. Each of the statements recounted above about Cohodes was false and defamatory and intended to both harm Cohodes's reputation and conceal MiMedx's, Petit's, and Taylor's illegal conduct.

  97. ███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████████
█████████████████████

  98. In January 2018, Cohodes wrote to MiMedx's independent auditors, Ernst & Young, alerting them to the accounting issues that he had identified through his investigations. Upon review of that letter, Ernst & Young notified MiMedx that it would need to investigate those issues and could not certify MiMedx's 2017 financial statements.

  99. Then, on February 26, 2018, Bloomberg published an article reporting that the United States Department of Justice was investigating whether MiMedx was overcharging the federal government, and whether it was engaged in a fraudulent sales and accounting practice called “channel stuffing.”

  100. The next day, MiMedx responded by claiming it was unaware of any such investigation and by trying to deflect the bad news by attacking Cohodes. In a press release published on the MiMedx website, the company stated:

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

27

The public should be well aware that the Company has been under a concerted, illegal short selling attack since September. This group of illegal short sellers, which the Company believes includes Marc Cohodes, Aurelius Value, Viceroy Research, and other numerous hedge funds and individuals, has publicized a continuous stream of misinformation and lies about numerous aspects of the Company's business.

101. Once again, these statements about Cohodes were false and defamatory and intended to both harm Cohodes's reputation and conceal MiMedx's, Petit's, and Taylor's illegal conduct.

102. Snowdy obtained money and/or other items of value from MiMedx or its agents on the basis of his claims that he had, or could obtain, recordings of Cohodes, emails to or from Cohodes, and information that would show Cohodes unlawfully manipulating MiMedx securities.

103. The "objectives" that MiMedx and Pernini provided to Snowdy pursuant to MiMedx's engagement of him could not be achieved, as a practical matter, without Snowdy engaging in fraud, deceit, and unlawful recording of telephone calls or other wire communications. Moreover, MiMedx itself had a pervasive practice of improperly recording its own employees in an effort to retaliate against and discredit whistleblower employees. An internal investigation conducted by MiMedx's outside counsel found that Petit oversaw an internal spying program called "Project Snow White" that generated at least 2,750 hours of secret surveillance video of its own employees, plus secret recording of telephone conversations, all obtained without the consent of all the participants. On information and belief, Cohodes alleges that MiMedx, through its employee or agent Snowdy, also recorded Cohodes's telephone conversations without his knowledge or consent and subjected him to video surveillance.

104. In the end, Cohodes was vindicated. MiMedx ultimately withdrew its annual financial statements for the years 2012 through 2016, plus the quarterly financial statements for the first, second, and third quarters of 2017. MiMedx's stock was delisted, both Petit and MiMedx's COO William Taylor were ultimately convicted of securities fraud and sentenced to prison, and on April 6, 2020, the company announced that it had agreed to pay $6.5 million to resolve False Claims Act allegations that it knowingly submitted false information to the Department of Veterans Affairs.

## H. Harms to Cohodes and Unlawful Benefits to Snowdy

105. As a direct and proximate result of Snowdy's and Guy's unlawful conduct, Snowdy and MiMedx unjustly benefitted and Cohodes was damaged.

---

106.    First, Snowdy was unjustly enriched by the amounts Guy and Harrington Global paid Snowdy (directly or through lawyer intermediaries) to lie to Cohodes, record Cohodes's phone conversations, disclose Cohodes's emails, and defame Cohodes to third parties.

107.    Second, Snowdy was also unjustly enriched by the amounts that MiMedx or other third parties paid him, wholly or partly in reliance on Snowdy's past success in unlawfully obtaining Cohodes's emails and phone calls, to surveil Cohodes or to seek access to Cohodes's confidential communications again.

108.    Third, by spying on Cohodes and obtaining information about him unlawfully, MiMedx, Petit, and Taylor were able to persuade some market participants and regulatory agencies, at least temporarily, that MiMedx, Petit, and Taylor were victims of securities fraud rather than perpetrators of it, which allowed them to retain the benefits of their illegal conduct.

109.    Fourth, Cohodes was directly harmed in that, among other harms,

    a.    Snowdy unlawfully and improperly obtained access to Cohodes's home, as a trespasser;

    b.    Snowdy unlawfully and improperly obtained access to Cohodes's private business information concerning Cohodes's lawful efforts to expose fraud and questionable accounting at Concordia and at Badger Daylighting, among other companies;

    c.    Snowdy undermined and interfered with Cohodes's lawful efforts to expose fraud and questionable accounting at Concordia and at Badger Daylighting, among other companies, by disclosing Cohodes's emails and phone calls to third parties;

    d.    Snowdy unlawfully invaded Cohodes's privacy by obtaining access to his home and recording his phone calls; and

    e.    Snowdy defamed Cohodes and harmed him in his professional reputation by asserting, contrary to fact, that Cohodes was a criminal, a stock manipulator, a tax evader, and a money launderer.

**FIRST CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act Under California Penal Code § 632.7**
**Against All Defendants**

110.   Plaintiff repeats and realleges paragraphs 1-109.

111.   As part of a scheme to accuse Cohodes and other short sellers of supposed market manipulation, Defendants Guy and Harrington Global employed Defendant Snowdy beginning around October 2015 for the purpose of surveilling Plaintiff Cohodes, a California resident.

112.   As part of this scheme, Snowdy engaged in cellular or cordless telephone communications with Cohodes to gather information.

113.   From 2016 and into 2018, Snowdy intentionally recorded dozens of cellular or cordless telephone communications between himself and Cohodes.  All of Cohodes's telephone communications with Snowdy were made using Cohodes's cellular phone.

114.   At no time did Snowdy inform Cohodes that their cellular or cordless telephone communications were being recorded, and at no point did Cohodes consent to the recording of the communications.

115.   Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes were all undertaken at the direction of Guy and Harrington Global, while acting as Guy's and Harrington Global's agent or employee.

116.   Beginning in January 2018, Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes were also undertaken at the direction of MiMedx, while acting as MiMedx's agent or employee.

117.   From 2016 to 2019, Cohodes remained a California resident and California citizen, and Snowdy's, Guy's, and MiMedx's surveillance of him were directed at him in California.

118.   Cohodes first became aware that Snowdy had recorded their cellular or cordless telephone communications when, in May 2021, documents produced in a series of Canadian lawsuits were unsealed by the Ontario Superior Court of Justice.

119.   As a California resident, Cohodes is guaranteed a right to privacy by not only the California Constitution, but also by California Penal Code § 630 *et seq*.  California Penal Code § 637.2 –

a section of the California Invasion of Privacy Act – provides a civil cause of action against those who record a communication between a cellular or cordless telephone and another telephone without the consent of all parties in violation of California Penal Code § 632.7.  California Penal Code § 637.2 fixes the amount of damages recoverable at $5,000 per violation.

120.   California Penal Code § 637.2 further entitles Plaintiff Cohodes to bring an action to enjoin and restrain any violation of California Penal Code § 630, *et seq*.

121.   By recording dozens of cellular or cordless telephone conversations with Cohodes without his knowledge or consent, Snowdy, Guy, Harrington Global, and MiMedx violated California Penal Code § 632.7.

122.   As the direct and proximate result of Defendants' violations of California Penal Code § 632.7, Plaintiff Cohodes has suffered damages and ongoing irreparable harm in the form of invasion of privacy.

123.   As a direct result of Snowdy's unlawful recording of Cohodes's phone calls, Snowdy has been unjustly enriched, including but not limited to the $25,000 per month that he was paid by Guy, and all sums that he was paid by MiMedx.

124.   Each of the Defendants acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

## SECOND CAUSE OF ACTION
### Violation of the Wiretap Act (18 U.S.C. §§ 2511)
### Against All Defendants

125.   Plaintiff repeats and realleges paragraphs 1-124.

126.   The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. . . ." 18 U.S.C. § 2510(12).

127.   ECPA also broadly defines the contents of a communication.  Pursuant to ECPA, "contents" of a communication, when used with respect to any wire, oral, or electronic communications,

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

31

include any information concerning the substance, purport, or meaning of that communication. 18 U.S.C. § 2510(8).

128.    Part of ECPA is the Wiretap Act, 18 U.S.C. § 2511, which prohibits the interception and disclosure of wire, oral, and electronic communications. Although the Wiretap Act generally only requires the consent of one party to a communication to record the communication, a party may not record a communication for the purpose of committing any criminal or tortious act in violation of federal or state law. 18 U.S.C. § 2511(2)(d).

129.    The Wiretap Act also provides a civil cause of action for any person whose wire or electronic communications have been intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511, as well as for the disclosure or use of the contents of such intercepted communications.

130.    Cohodes's cellular phone calls with Snowdy are "electronic communications" under ECPA.

131.    At no time did Snowdy inform Cohodes that telephone communications were being recorded, and at no point did Cohodes consent to the recording of the communications.

132.    Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes were all undertaken at the direction of Guy and Harrington Global, while acting as Guy's and Harrington Global's agent or employee.

133.    Beginning in December 2017, Snowdy's recording of Cohodes's phone calls and his efforts to surveil Cohodes were also undertaken at the direction of MiMedx, while acting as MiMedx's agent or employee.

134.    From 2016 to 2019, Cohodes remained a California resident and California citizen, and Snowdy's, Guy's, Harrington Global's and MiMedx's surveillance of him was directed at him in California.

135.    Snowdy later disclosed the contents of at least one of those calls to lawyers and executives at Catalyst. On information and belief, Snowdy also disclosed the contents of those calls to MiMedx.

136.    Even if Snowdy himself consented to recording the communications, he, Guy, and

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

32

1    Harrington Global violated 18 U.S.C. § 2511(2)(d) because Snowdy recorded the calls for the purpose of

2    committing defamation and false light invasion of privacy, both torts under California law.  In addition,

3    MiMedx violated 18 U.S.C. § 2511(2)(d) because Snowdy recorded calls on behalf of MiMedx for the

4    purpose of concealing and continuing MiMedx's, Petit's, and Taylor's ongoing securities fraud, in

5    violation of 15 U.S.C. § 78j(b) and 15 U.S.C. § 78ff (as well as other federal and state securities las and

6    regulations), and for the purpose of defaming Cohodes.

7          137.   As the direct and proximate result of Snowdy's intentional recording and disclosure of

8    Cohodes's cellular telephone calls, Cohodes has suffered damages.

9          138.   As a direct result of Snowdy's unlawful recording of Cohodes's phone calls, Snowdy has

10   been unjustly enriched, including but not limited to all amounts he was paid by Guy and Harrington

11   Global, and all sums that he was paid by MiMedx.

12         139.   Defendants acted with malice, fraud, and oppression, such that Cohodes is entitled to

13   punitive damages.

14

15                              **THIRD CAUSE OF ACTION**
                      **Defamation – Slander Under California Civil Code § 46**
16                          **Against Defendants Snowdy and Guy**

       140.   Plaintiff repeats and realleges paragraphs 1-139.

17         141.   As alleged above, in his written and oral communications with Glassman and Catalyst's

18   attorneys, Guy made numerous false assertions of fact that were intended to, and had the effect of,

19   portraying Cohodes as a criminal, actively conspiring with other criminals to manipulate public

20   securities markets and launder money.

21         142.   As alleged above, in oral communications with Catalyst's attorneys and advisors,

22   Snowdy made numerous false assertions of fact that were intended to, and had the effect of, portraying

23   Cohodes as a criminal, actively conspiring with other criminals to manipulate public securities markets,

24   launder money, and evade taxes.  With respect to the statements by Snowdy, he made them at the

25   direction of Guy and Harrington Global, while acting as Guy and Harrington Global's agent or

26   employee.

27         143.   Guy's and Snowdy's statements and their implications of criminal behavior by Cohodes

28

---

were false. At all times, Guy was acting on behalf of Harrington Global.

144. At the time they each made these statements, Guy and Snowdy knew they were false and unsubstantiated.

145. Snowdy was incentivized to claim that Cohodes was acting illegally in order to stir up interest in the calls he had recorded between him and Cohodes without Cohodes's consent. For example, if Catalyst believed that Cohodes was making illegal trades or attempting to manipulate the securities market, then it stands to reason that Catalyst would pay a hefty sum for information on Cohodes's next moves.

146. The statements Snowdy made to Riley and Lutes were defamatory. Riley and Lutes understood Snowdy's statements (1) to mean that Cohodes was participating in illegal activities and (2) to damage Cohodes's reputation as an investor.

147. Likewise, Snowdy's statements were unprivileged. The lawyers to whom Snowdy made the statements were Catalyst's lawyers, not Snowdy's, and no privilege applies to Snowdy's false statements.

148. Guy's and Snowdy's statements to Glassman and to Catalyst's lawyers accused Cohodes of committing a crime, and consequently constitute libel *per se*.

149. At the time that Snowdy and Guy made these statements, they knew that Catalyst was preparing to file lawsuits against investors claiming that those investors had illegally manipulated the shares of Callidus. Consequently, Snowdy and Guy knew, or had reason to know, that their false statements would likely be repeated in the litigation and disseminated to a wider audience, which is what in fact occurred.

150. As the direct and proximate result of Guy's and Snowdy's statements, Cohodes has suffered injury to his professional reputation.

151. Guy, Harrington Global, and Snowdy acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

**FOURTH CAUSE OF ACTION**
**False Light Invasion of Privacy**
**Against Defendants Snowdy, Harrington Global, and Guy**

152.    Plaintiff repeats and realleges paragraphs 1-151.

153.    The California Constitution guarantees the right to privacy.  Cal. Const. art. I, § 1.  This right to privacy protects the citizens of California from, among other things, being portrayed to other individuals in a false light.

154.    During his meetings with Catalyst's lawyers and executives, Snowdy was acting as the agent of Guy and Harrington Global.

155.    During his meetings with Catalyst's lawyers and executives, Snowdy repeatedly asserted that Cohodes was involved in illegal market manipulation.

156.    For example, in his September 12, 2017 meeting, Snowdy claimed he had fed Cohodes Concordia Healthcare's 2016 Q4 numbers with slight alterations.  Snowdy then stated that, two days before those numbers were made public, Cohodes shorted Concordia's stock based on the altered information Snowdy fed him.

157.    These statements by Snowdy were false and created a false impression about Cohodes. To start, Snowdy's statements falsely state or imply that Cohodes's investing strategy relies on illegal market manipulation schemes or nonpublic information.  In reality, Cohodes has long been a successful investor because, through careful analysis, he can identify companies that are overvalued or may be conducting fraudulent or otherwise illegal activities.  Throughout his career, Cohodes has worked with law enforcement to provide relevant information for investigations.  And by playing some or all of a September 6, 2017 recording at the September 12, 2017 meeting, Snowdy intended to suggest that Cohodes improperly or unlawfully harassed companies like Badger Daylighting.  These implications were false.

158.    Snowdy's statements were understood by Catalyst's lawyers, executives, and private investigators – Naomi Lutes, Jim Riley, Tom Klatt, and Peter Barakett – to imply that Cohodes had no respect for the rule of law and that he was involved in illegal investing schemes, including market manipulation and investing based on nonpublic information.

159.    Likewise, in the September 12, 2017 meeting Snowdy mischaracterized the actual email communications between Cohodes and Levitt to falsely suggest that Cohodes was manipulating the securities market and the whistleblower system.  Catalyst's investigators from Black Cube believed and acted upon that mischaracterization.

160.    At the time that Snowdy made these statements, he and Guy knew that Catalyst was preparing to file lawsuits against investors claiming that those investors had illegally manipulated the shares of Callidus.  Consequently, Snowdy and Guy knew, or had reason to know, that their false statements would likely be repeated in the litigation and disseminated to a wider audience, which is what in fact occurred.

161.    As the direct and proximate result of Snowdy's statements, Cohodes has suffered injury to his professional reputation.

162.    Guy, Harrington Global, and Snowdy acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

**FIFTH CAUSE OF ACTION**
**Trespass**
**Against Defendant Snowdy**

163.    Plaintiff repeats and realleges paragraphs 1-162.

164.    In 2016, Snowdy visited the home Cohodes owned in Sonoma County, California. Snowdy was acting as the agent of Guy and Harrington Global

165.    Snowdy obtained Cohodes's consent to enter and remain on Cohodes's property by falsely holding himself out as a person who was adverse to Concordia and Concordia's CEO Thompson and aligned with Cohodes, when in fact Snowdy had been hired to spy on Cohodes and attempt to gather evidence that Cohodes was a criminal.

166.    Cohodes would not have allowed Snowdy to enter or remain on his property, but for Snowdy's material misrepresentations and omissions.

167.    As a direct result of the trespass, Snowdy was able to gain access to Cohodes and establish a relationship with him, which he then used to record Cohodes's phone calls and to obtain his emails, causing him further harm.

168.   Guy and Snowdy acted with malice, fraud, and oppression, such that Cohodes is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cohodes respectfully prays for judgment in his favor against Defendants MiMedx, Snowdy, Guy, and Harrington Global as follows:

a.   Damages in the amount of $5,000 per violation of California Penal Code § 632.7;

b.   For all remedies specified in the Wiretap Act, 18 U.S.C. § 2520, including the sum of actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violations or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater;

c.   Compensatory damages according to proof at trial;

d.   Punitive damages in an amount sufficient to punish Defendants' wrongful conduct and to deter future misconduct;

e.   The return of all documents, information, and data that Defendants unlawfully obtained from Cohodes;

f.   Disgorgement of all sums that Snowdy obtained from Guy, Harrington Global, MiMedx, or any other person or entity as a result of his violations of Cohodes's rights;

g.   Permanent injunctive relief enjoining Defendant Snowdy from recording the cellular or cordless telephone communications of Plaintiff Cohodes without the consent of all parties to those communications;

h.   Permanent injunctive relief enjoining Defendant Guy, Harrington Global or their agents from recording the cellular or cordless telephone communications of Plaintiff Cohodes without the consent of all parties to those communications;

i.   Permanent injunctive relief enjoining Defendant MiMedx from recording the cellular or cordless telephone communications of Plaintiff Cohodes without the consent of all parties to those communications;

j.   Costs and reasonable attorneys' fees incurred in this action; and

1      k.      Such other relief as the Court may deem just and proper.

2

3    Dated: December 18, 2023            Respectfully submitted,

4                                THE NORTON LAW FIRM PC

5                    By:   */s/ Fred Norton*

6                                  Fred Norton
                                      Attorneys for Plaintiff

7                                Marc Cohodes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

38

1

## **DEMAND FOR JURY TRIAL**

Pursuant to Civil Local Rule 3-6 and Federal Rule of Civil Procedure 38, Plaintiff Marc Cohodes

hereby demands a trial by a jury on all issues triable by a jury.

Dated: December 18, 2023                    Respectfully submitted,

THE NORTON LAW FIRM PC

By:   */s/ Fred Norton*
_____
Fred Norton
Attorneys for Plaintiff
MARC COHODES